180 P.3d 69 (2008)
218 Or. App. 436
In the Matter of F.(F.)W., a Minor Child.
STATE ex rel. JUVENILE DEPARTMENT OF MULTNOMAH COUNTY, Appellant,
v.
F.W., D.F., and F.(F.)W., Respondents.
In the Matter of E.W., a Minor Child.
State ex rel. Juvenile Department of Multnomah County, Appellant,
v.
F.W., D.F., and E.W., Respondents.
9005813791 and 9207825133; 21372 and 103573; A136575 (Control) and A136579.
Court of Appeals of Oregon.
Argued and Submitted January 22, 2008.
Decided March 19, 2008.
*70 Laura S. Anderson, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Heather A. Vogelsong, Assistant Attorney General.
Patrick M. Ebbett argued the cause for respondent F.W. With him on the brief was Chilton, Ebbett & Galli, LLC.
Lea Ann Easton argued the cause for respondents E.W. and F.(F.)W. With her on the brief was Law Office of Craig Dorsay.
No appearance for respondent D.F.
Before SERCOMBE, Presiding Judge, and BREWER, Chief Judge, and DEITS, Judge pro tempore.
BREWER, C.J.
The state appeals and the children cross-appeal from judgments dismissing the state's petition to terminate father's parental rights to the child E, and the child F's amended petition to terminate father's rights with respect to F. The state and the children assert that the court erred in failing to terminate father's rights under ORS 419B.504 on the ground of unfitness. On de novo review, ORS 419A.200(6)(b), we reverse.
Father, who was 48 years old at the time of trial, has had a troubled life. He first used alcohol at age 12 and first used marijuana at age 14. Throughout most of his life, he used crack cocaine, marijuana, and heroin; his drug of choice was crack. Father was first arrested at 15, and, by the time of trial, he had numerous convictions for robbery, possession of a controlled substance, auto theft, and other property crimes. Father spent 12 years in prison for attempted bank robbery and another year in prison in 1998 and 1999 for violating his parole after submitting a urine sample that tested positive for a controlled substance. Since 2000, father has participated, with varying degrees of success, in 10 drug treatment programs. When father completed a treatment program in May 2001, a counselor stated that father had "internalized the values of self-directed recovery."
F was born in April 2001 while his mother was in residential drug treatment. F was removed from his mother's care in September 2001 and placed in protective custody *71 because of his mother's drug abuse. Soon after F was placed in protective custody, DHS learned that father had been established as F's biological father. It then arranged for visitation between father and F. DHS determined that father could not have custody of F because of father's own substance abuse problems. As a consequence, F was placed in foster care.
In November 2001, DHS entered into a service agreement with father. Father agreed to submit to a drug and alcohol evaluation, attend parenting classes, and maintain a clean and stable residence. At that time, father was employed, had a residence, and was engaged in drug treatment. However, father did not complete the program.
Father married E's mother in late 2001.[1] E's mother had substance abuse problems of her own, was actively using drugs at the time, and had other children who were not in her custody. In order to facilitate F's return to father, the agency tried to include E's mother in services as well.
In March 2002, DHS developed a new service agreement for father which, in addition to the previous requirements, included family therapy in an effort to draw E's mother into services and keep the family safe. Father participated in parenting classes in early 2002. In March, Dr. Deitch, a clinical psychologist, performed a psychological evaluation on father. Deitch diagnosed father with a personality disorder not otherwise specified, with antisocial and dependent features, and a reading disorder. Deitch also was concerned about father's substance abuse and recommended that father participate in drug and alcohol treatment programs. In light of father's personality disorder, together with his "past pattern of criminal behavior, addiction and poor decision-making, along with current observations," Deitch forecast a "poor prognosis for [father] being a long-term parenting resource for [F]." He softened that prognosis with the further opinion that "[a] strong commitment to a program of recovery could change this prognosis over time."[2]
In July 2002, after a permanency hearing, the agency changed its plan for F to adoption. F remained in foster care. In September 2002, father was arrested for a federal parole violation and served one month in prison. After father was informed that the next step in DHS's plan was termination, father began to engage in more services. He appeared to stop using drugs, maintained employment and a stable residence, and he visited F regularly. Father also established a rapport with F's foster parents, who supported father's efforts.
In August 2002, E's mother gave birth to E. At the time, and for several months thereafter, E's mother lived with her own mother. For the rest of 2002 and through early 2003, father and E's mother cycled through intervals of drug use, abstinence, and relapse. In March 2003, father signed a new service agreement with DHS that directed him to engage in outpatient substance abuse treatment.
In May 2003, DHS placed F with father for the first time. At the same time, E was placed with E's mother in E's grandmother's home. In June, father completed his federal parole, and he moved to California to be near his own family. At the same time, DHS closed the dependency case for the children. In June, E's mother also moved to California to be near father, but she returned to Oregon with E in June. In May 2004, father returned to Oregon with F, and he contacted F's former foster parents. For the next three months, the foster parents provided financial assistance and respite care for father.
In August 2004, E's mother and father resumed their drug use; at the time, they were living together periodically. DHS reopened the case for both children and offered the parents drug and alcohol services. In October, father was evaluated by a drug counselor, who recommended that he engage *72 in outpatient treatment. In December, the parents agreed that F's former foster parents would have custody of F and that E's grandmother would have custody of E. In December, father attended a family decision meeting with DHS representatives, after which he reluctantly agreed to voluntary services, including a drug and alcohol assessment. In February 2005, DHS was planning to return the children to parents, but both parents relapsed and the children remained in foster care. At that time, father's attendance at his drug treatment sessions became sporadic, he tested positive for cocaine, and he was discharged from outpatient treatment.
In February 2005, DHS filed a juvenile court dependency petition for both children in which it alleged that father's chronic substance abuse had impaired his ability to parent the children. Father stipulated to the court's jurisdiction, agreed to complete inpatient drug treatment, and entered a residential program at Alpha House. In April 2005, F and E were placed with E's mother in a residential substance abuse treatment facility. In May, E's mother left the treatment facility, and both children were placed with F's former foster parents.
In July 2005, F, who was experiencing adjustment problems, began mental health counseling. F's therapist diagnosed him with an adjustment disorder with mixed disturbance of emotions and conduct. In August, father completed an inpatient substance abuse program and then began an aftercare outpatient program. DHS evaluated father's support system and helped him obtain custody of the children. At that time, the children's caseworker was concerned that the children needed a permanent placement. From September through late November, the children were placed with father. During that interval, father received assistance with the children from E's grandmother and aunt. On October 30, father tested positive for cocaine. DHS then held a family decision meeting. The agency prescribed more one-on-one counseling services for father and warned him that, if he relapsed again, the children would be removed. On November 26, father relapsed again, and the children were returned to their foster parents.
Between December 2005 and January 2006, father was on a waiting list for inpatient substance abuse treatment. However, he failed to attend outpatient treatment sessions and was discharged. During the period from January through April, father and E's mother missed several visits with the children; the children had adverse reactions to the missed visits. In March, DHS ordered mental health assessments for both children. As explained in greater detail below, Dr. Borg, a child psychologist, diagnosed E with reactive attachment disorder, and he diagnosed F with an adjustment disorder, coupled with anxiety and depressed mood.
In April 2006, father reentered residential drug treatment at Alpha House. In May, the court held a permanency hearing for the children, after which their plan was changed to adoption. At that time, E began mental health counseling, and her therapist recommended that father's visits be suspended. Father voluntarily suspended visits with both children. Between April and September, father participated in and graduated from an inpatient substance abuse treatment program. Although he missed some group sessions, his counselor testified that father's prognosis was excellent.
In April 2006, Dr. Basham performed a psychological evaluation on father, diagnosing him with cocaine dependence, personality disorder not otherwise specified, and concluding that he was at risk of a further relapse. Father's life stresses  particularly the stress of being a single parent  concerned Basham, because father appeared to be prone to relapse under stress. The personality assessment inventory that Basham administered to father showed characteristics of grandiosity and social dominance. Basham testified that those characteristics are aspects of a narcissistic personality disorder. Basham also was trained in clinical child psychology. Basham testified that parents with father's traits are egocentric and have difficulties looking at themselves from the perspectives of others. Basham stated that such parents find it difficult to understand the problems of a child with a reactive attachment *73 disorder and to deal with rejection from such a child. Basham testified that father's drug dependence, together with his personality disorder, were major risk factors in parenting two special needs children. Basham observed that father was usually successful with his treatment programs because the focus was on helping and supporting father. However, when his role switched to that of a parent, he found parenting quite stressful.
To his credit, in the year before trial, father attempted to address the mental health problems that Basham diagnosed in 2006. In July 2006, while in residential drug treatment, father began mental health counseling sessions with therapist Guiden, who diagnosed father with an adjustment disorder with anxiety and depression, exacerbated by the stresses involved with losing custody of his children. At trial, Guiden testified that father had made significant progress, citing not only his progress in mental health treatment but his completion of substance abuse treatment, his taking parenting classes, and his obtaining a sponsor, job training, and employment. Guiden also worked with father in reaching the decision to terminate his unhealthy relationship with E's mother within a few months after he began counseling with Guiden. In addition, father received some basic information from Guiden about reactive attachment disorders. According to Guiden, father's mental health issues are not a barrier to parenting; she opined that father was ready for the children to be returned to his care. However, Guiden mistakenly believed, based on telephone conversations that she had with the children's mental health therapists in December 2006 and January 2007, that the children were doing well and did not need additional assistance.[3]
In November 2006, father entered outpatient treatment in the ChangePt. program, where he was assigned a counselor, Sippey, with whom he had worked in the past. Father attended one outpatient counseling session per month. Also in November, father moved into "clean and sober" housing. Between November 2006 and March 2007, father participated in a job training program, where he was described as a "role model." In March, father obtained full-time employment. Between January and April 2007, father attended only one ChangePt. meeting but, on several occasions, he contacted Sippey by telephone for support. In May, father was successfully discharged from the ChangePt. program.
Dr. Ethel-King, a psychologist, evaluated father at his attorney's request in March 2007. Like Basham, Ethel-King diagnosed father with a personality disorder, but he did not observe the narcissistic features that Basham found. Ethel-King did not assess the children's needs. Like Guiden, Ethel-King did not believe that father's personality disorder was a barrier to parenting. Unlike Guiden, however, Ethel-King testified that father would not be ready to parent the children for an additional year to 18 months. Ethel-King attributed father's progress to his sobriety and participation in mental health treatment. According to Ethel-King, father's willingness to seek help in multiple areas during the preceding year contraindicated a diagnosis of narcissism. When asked how father's progress over the previous year differed from his progress in previous periods of temporary improvement, Ethel-King opined that father actually was participating in mental health treatment this time, as opposed to earlier periods when he had not addressed the psychological reasons for his drug use.
*74 Both F and E have significant mental health needs. As discussed, in March 2006, they were evaluated by Borg, who testified at trial. Borg diagnosed E with a severe early childhood reactive attachment disorder, with possible emerging traits of oppositional defiant disorder. Reactive attachment disorder refers to an "ongoing pattern of either lack of primary attachments or very distorted functioning within primary attachment relationships." Characteristically, a child with that disorder cannot distinguish between "who is safe and not safe," "rejects efforts from others to help them soothe," and "rejects * * * relationships * * * that would help one soothe and help one function and build all those age-appropriate interaction skills." Oppositional defiant disorder is characterized by "argumentativeness, noncompliance, sort of knee-jerk responses of no, regardless of what's being asked. Irritability, seeking of retaliation for perceived slights."
Borg recommended that E be tested for sensory integration problems and that she continue to receive mental health counseling. Borg also recommended that, unless "there [is] some evidence that she was somehow at tremendous risk in the [foster parents'] home, I wouldn't recommend removing her from that placement under any circumstances." He also testified that E would have special needs if she were placed in her father's home, that he would "expect a regression in whatever gains that she has made over the time that she had been in her current home." He also would expect that
"based on just the length of time that she's been in [the foster] home and the services that she's been getting, that she would go through at least the initial stages of grief associated with an attachment disruption, and that it would be at high risk  she'd be at high risk for never actually resolving those stages of grief and reattaching to someone else."
Borg further testified that, if E were returned to father and, due to a further relapse, were once again removed from his custody, she probably never would resume a relationship of trust with her current foster parents. According to Borg, from a psychological and developmental standpoint, a reasonable time for her permanent placement "passed a long time ago." In his written evaluation of E, Borg stated:
"Above all else, [E] does need a stable and consistent home. If she is going to internalize a sense that relationships can [be] reliable, enduring, and comforting in life, she is going to need to be living within a context in which her relationships are indeed reliable and enduring. Her current difficulties are likely to create challenges for her caregivers over the future, as kids experiencing attachment disturbances are often very intense, confusing, needy and rejecting in their interactions. This of course results in frustration and confusion for adults caring for them, but it is important to bear in mind that the emotions adults experience in reaction to [E's] behavior are probably mild in comparison to what [E] herself is experiencing."
Borg diagnosed F with adjustment disorder with mixed anxiety and depressed mood. He also noted a "rule-out" diagnosis of emerging Attention-Deficit/Hyperactivity Disorder. Borg testified that an adjustment disorder is a change from a relatively normative level of functioning as reflected in symptoms of anxiety, behavioral problems, mood change, and difficulties in concentration that arise from a specific environmental stress or collection of environmental stressors, where the severity of symptoms "does not rise * * * to the level of a formal mood disorder or anxiety disorder or disruptive behavior disorder." According to Borg, F's stressors included the placement of E in the foster home that F had come to view as his own, the impact of E's special emotional and behavioral needs that disrupted the household, and F's own sense of impermanence and anxiety about his own future if he were removed from his foster placement. In his written report, Borg stated:
"More immediate concerns are related to the current uncertainty regarding [F]'s future as well as to the adjustment demands placed on him as a result of his sister's placement in the same home. In the former area, it is important to acknowledge that, in his mind, [F] is facing the potential loss of the home he has come to know as *75 his own, and the family around whom he has organized his primary attachments. Anticipating this kind of loss would be extremely unsettling for a child of any age, but the anxiety is even greater for kids who are still in a developmental stage when they are extra-vulnerable to stress in the face of separation. For this reason, I do recommend that the ambiguity around [F]'s placement future be resolved as soon as possible: this little boy has essentially lived his whole life without a legally permanent home, and he is now at a stage when he can appreciate that the emotional roots he has put down are far more tenuous and fragile than he had ever considered. Having him remain in such a state of uncertainty for much longer will only unsettle him further."
At trial, Borg testified that F felt that he already was in his home and the legal proceedings were a threat to the permanence of that home. If F were returned to father, Borg opined that F would likely "grieve the way a child who loses his or her parents grieves." At the time of trial, F had lived with his foster parents for almost four of his six years.
At trial, father showed limited insight into F's attachment concerns. When asked whether F had any emotional problems, father testified that he thought F's emotional problems were caused by DHS removing F from his care. Father also testified that he had learned that he needed to pay attention to the children, enforce discipline, and love them more. Father testified that he understood that he had harmed the children by using drugs and staying away from them. However, father was unable to recall why he had relapsed from abstinence in 2004. Nor did father remember why he had relapsed in the fall of 2005. Moreover, after sitting through several days of testimony by mental health experts at trial, father did not know F's diagnosis, and he could not recall Borg's testimony.
The only insight that father articulated regarding E's needs was a colloquy with the state's counsel, in which father acknowledged that E had attachment and abandonment issues. Nonetheless, father opined that E got her reactive attachment disorder "from her mom." Father also testified that having the children with him would not make it more difficult to stay clean and sober. Furthermore, father testified that single parenting was not overwhelming when the children were returned to him in September 2005 and that he did not presently need help parenting the children.
The trial in this case was held over a three-month interval from April through July 2007. During that period, father was working full time and living in a "clean and sober" apartment. Father had a Narcotics Anonymous (NA) sponsor and testified that he attended two NA meetings per week.
At trial, Basham testified that, because of his personality disorder, father was at risk of further relapse if the children were returned to him, despite the fact that he had made some gains during the year before trial. According to Basham, it would be devastating for the children, given their special needs, to experience another cycle of reunification and removal in the event that father suffered a further relapse after they had been placed with him. Basham opined that, although father had achieved employment, undertaken drug treatment, and found stable housing, those gains did not translate into an ability to deal with special needs children. According to Basham, father's problems were exacerbated when he lived with the children. Because father's problems were the result of a personality disorder, Basham opined that additional classes or programs would not result in an appreciable improvement in his capacity to parent special needs children. Basham concluded that, although father had a genuine desire to be a good parent, it was difficult for him to be open to the feedback of others. When asked about father's definition of "working on abandonment issues" as "the loss of his children," and father's understanding that codependency means "depending on others," Basham testified that those explanations showed little insight into the children's needs or father's own circumstances. Basham testified that, because of his personality disorder, father's parenting prognosis was poor. *76
In a detailed and thoughtfully written opinion, the juvenile court concluded that F had not proved by clear and convincing evidence that father was presently unfit by reason of conduct or conditions seriously detrimental to F. The court denied the state's petition to terminate father's parental rights to E on the same ground. The court made the following findings of fact and conclusions of law with respect to the state's assertions that father was unfit by reason of his substance abuse and mental health problems:[4]
"1. Re Father's use of controlled substances:
"Father has a history of using controlled substances that is at least three decades long. While marijuana and cocaine typified his use in his teen and early years, he also used methamphetamine and developed an opiate dependency that lasted 15 years. He has struggled most recently with cocaine, admitting daily use for seven months as his last episode. Since 2000, has participated in at least ten treatment attempts in the following sequence: DePaul Outpatient, DePaul InPatient, Tualatin Valley Outpatient, Project Network/Ugaza Outpatient, CODA Outpatient, Coda Inpatient, CODA Outpatient, Hooper Detox, CODA Inpatient, and Counterpoint Outpatient. He did not complete all programs. This pattern of substance abuse has unquestionably caused serious harm to [F] because Father has been physically absent and unable to provide a home when in residential programs, his addiction prevented him from focusing on and responding to [F]'s emotional needs, and the failure of two reunification efforts and the resulting delay [i]n permanency have contributed to an adjustment disorder that is causing [F] extreme anxiety. Yet Father is currently in a cycle of sustained full remission in his addiction, signifying at least one year's sobriety. He completed his last treatment requirements with substantial compliance, and has moved into a community maintenance phase. He currently attends AA or other support groups (though with no regularity), periodically checks in with his most recent out-patient drug counselor, and is productively addressing his relapse scenarios with his mental health counselor. No convincing evidence of use or regular association with individuals who are using was produced. In addition, he has obtained and maintained drug-free housing, completed a 10-week vocational program and gained  then lost  employment. Father is actively working his recovery program. While he has had at least one year-long period of sobriety before and relapse remains a significant risk, the Court concludes that considering the totality of evidence, present unfitness based on substance abuse was not proven clearly and convincingly under precedents set out by the Oregon appellate courts.[[5]]
"2. Re Father's mental health problems
"A number of factors involving Father's mental health affect his parenting abilities but convincing evidence is lacking that they constitute present unfitness. First, Father has borderline-to-below-average intelligence. This condition has made it difficult historically and presently for Father to understand and effectively deal with [F]'s adjustment needs. Yet Father's cognitive abilities alone do not preclude adequate parenting and this factor does not constitute unfitness. Secondly, Father has long-standing depression symptoms that underlie his historical addiction cycle. While the persistence of his symptoms and its contribution to his addiction is *77 evident, Father began one year ago mental health counseling focused on his depression, relapse cycles, and understanding his children's needs. He is `very engaged' in those sessions and his therapist notes that he has shown progress. Depression alone or with other factors does not constitute present unfitness in this situation.
"Finally and most significantly, Father has a personality disorder. All three psychologists who have evaluated Father agree on this diagnosis and the long-standing nature of the disorder. Yet the Court lacks clear and convincing evidence regarding the specific features of that current condition that impair parenting. Dr. Basham (the State's expert who saw Father in March 2006) found narcissistic paranoid features at that time which interfered with Father's ability to perceive his children's needs outside of a sphere of self-focus. He also found paranoid features that undercut Father's ability to form trusting relationships with providers or others that provide parenting resources.1 Dr. Ethel-King (Father's expert who saw Father just two weeks before trial) believes an insufficient number of criteria exist currently to categorize Father with a particular personality disorder.2 Dr. Ethel-King notes the improvement in Father's condition that has occurred in the intervening year: Father is taking more ownership of the effect of his addiction on his children, despite cynicism traits noted by both experts Father has established a trusting therapeutic relationship, and Father has maintained his sobriety. Simply said, on this record the Court lacks clear and convincing evidence of the seriously detrimental impact of an unspecified personality disorder on Father's ability to parent. Both separately and in combination, then, Father's mental and emotional problems do not render him presently unfit to parent [F]."
1. "Father's years of incarceration contributed to his reluctance to seek out and trust institutions and support systems."
2. "Dr. Ethel-King also diagnoses Father with an adjustment disorder, but opines that this is situational to the current stress in Father's life regarding not seeing his children and this litigation."
Despite having concluded that father was not unfit to parent the children, the juvenile court took the unusual additional step of rendering advisory findings and conclusions on the questions whether reintegration of the children into father's home within a reasonable time was probable and termination was in the children's best interests. The court answered the first question in the negative and the second question in the affirmative. Once again, the court's findings and conclusions concerning those issues bear careful consideration. With respect to F, the court stated:
"Although the preceding conclusion regarding fitness ends the Court's inquiry, the REMAINING FINDINGS are provided to aid the parties and any reviewing Court.
"5. The State has proven by clear and convincing evidence that reintegration of [F] into Father's home within a reasonable time is not probable. [F]'s special needs merit attention first in this analysis. [F] is a bright child and developmentally on track. He exhibits some behavior traits, (including overactivity) that are suggestive of Attentional Deficit/Hyperactivity although no diagnosis has been made. Unlike his sibling in the parallel case, he did not experience the multiplicity of moves as a toddler that severely undermined an ability to form attachments with caregivers. His primary and strong attachment is to the Foster Parents. He lived with his foster family as a toddler, for several months in 2004 and 2005, and then continuously since November 2005 when the second attempt at reunification with Father failed. [F] has a higher need for reassurance and stability than a child who has experienced consistency in caregiving. [F] does not want to live with his Father and has pronounced anxiety surrounding the issue of his permanent *78 placement. He has been diagnosed with an Adjustment Disorder attributed in part to this delay of permanency and in part to his adjustment to living with his sibling, who has very severe emotional problems. [F] has been participating in counseling for over two years. Adequate parenting for [F] requires significant psychological resources and a child-centered focus. [F]'s needs would severely tax any parent, much less a single parent in recovery.
"6. Father is clearly progressing in his recovery, working at the best of his ability, and is to be strongly commended for that. Were Father's efforts or motivation the measure for the `probability of timely reunification' prong, the Court's ruling on this element would be different. The personal resources Father needs to maintain his recovery, however, conflict with the time and attention [F] demands and deserves. Moreover, Father is not ready to resume care. Even Father's own expert (Dr. Ethel-King) indicated Father needed to `shore himself up' and it could be as much as one year (from March 2007) or even 18 months before Father could take on this responsibility. The evidence shows clear and convincingly that [F] simply cannot wait.
"7. Clear and convincing evidence exists that termination of the parental rights of [father] or other permanent arrangement that secured [F]'s residence with this foster family would be in the best interests of [F]. Several attempts to place [F] with Father have been attempted but failed. [F] is in a placement with long-term caregivers interested in adopting both him and his sibling. They have provided consistent, concentrated, and loving care and respite [F]'s whole life, while simultaneously attempting to support and encourage Father in developing and resuming a parental role. [F] is adoptable by this family, wishes to remain there, and needs permanency now. The Court, however, cannot secure that permanency with its ruling."
(Emphasis in original.)
With respect to E, the court stated:
"5. The State has proven by clear and convincing evidence that reintegration of [E] into Father's home within a reasonable time is not probable. [E]'s very substantial special needs merit attention first in this analysis. Her emotional and behavioral problems are largely caused by the disrupted attachments and multiple moves of her early years. Her anxiety is so pronounced that she associates the mere presence of her caseworker with the likelihood of being moved to a new placement. She has been diagnosed Reactive Attachment Disorder and Emerging [O]ppositional Defian[t] Disorder. In simple terms, she is unable to reconcile her innate need for supportive relationships with her trust in caregivers. This tension causes intense anxiety and mood disorders for which she lacks the ability to self-soothe, such that defiant behavior results. Her caretakers must be able to interpret and re-interpret inconsistent cues, requiring immense patience and control. Her risk of not being able to form healthy attachments as an adolescent and adult is pronounced. [E] also has sensory integration problems, perhaps connected to her prenatal drug exposure, for which she receives occupational therapy. Father has never had a significant bond with [E] and she has not spent anything other than nominal time in his care. [E]'s primary attachment historically had been to her [m]other until it transferred to the Foster Mother. Moreover, largely due to Father's own drug use, he was historically unaware and non-reactive to Mother's care of [E], as well as incapable of providing appropriate care himself had he been interested or physically available to do so. It was this dynamic that contributed to [E]'s multiple moves and caregivers, which in turn caused her attachment disorder. At this point, Father has not seen [E] in over one year, when his visits were suspended due to [E]'s regressive behaviors after parental visits. Father lacked historically the ability to provide for [E]'s basic needs and while he has made recent *79 efforts, while sober, to learn of her special concerns in his counseling, this education is occurring outside the context of actual contact with [E]. Even Father's own expert indicated Father could need one year or even 18 months `to shore himself up' psychologically and socially to assume parental care.
"6. [E]'s problems, however, are so pronounced and the degree of insight, patience, and effective advocacy needed to address her attachment problems so great that it is likely Father, for all the reasons detailed above, will never be able to meet those needs. Moreover, it is very highly probable that he will not be able to do so on a time frame that reasonably provides her the necessary permanency. According to Dr. Basham,3 [E]'s need for certainty in her placement  for emotional security about in her home and caretakers  is not imminent: it has passed. For Father, with whom more contact with [E] is presently contradicted for her emotional health, the opportunity for reunification has likewise passed. Were the standard for `probability of reintegration' the measure of Father's efforts or motivation, the Court's finding on reintegration would be different. Father is working at the best of his ability and is to be commended for that but these efforts do not translate into the probability of reasonably timely reunification when viewed against the backdrop of this child's permanency needs.
"Clear and convincing evidence exists that termination of the parental rights of [father] and other permanent arrangement that secured [E]'s residence with her foster family would be in her best interests. She is in a placement with long-term caregivers interested in adoption who have provided consistent, loving, and sophisticated care while simultaneously attempting to support and encourage Father in resuming his parental role. [E] is adoptable by this family and her needs for permanency are so pronounced at this point that any delay is manifestly against her best interests. Father's relatives recognize this. Mother has implicitly recognized this. The Court, however, cannot secure this permanency with its ruling.
3. "Dr. Ethel-King was less familiar with [E]'s needs and focused more on Father's psychological readiness to parent."
(Emphasis in original.)
On appeal, the state and the children assert that the juvenile court erred in declining to terminate father's parental rights to both children on grounds of unfitness. As will be seen from the discussion that follows, the juvenile court's thoughtful analysis in this case dictates a careful examination of the way that the appellate courts have, in certain recent decisions, analyzed and applied the requirements of ORS 419B.504.
That statute
"sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is `unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is `seriously detrimental' to the child. Second  and only if the parent has met the foregoing criteria  the court also must find that the `integration of the child into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change.'"
State ex rel. SOSCF v. Stillman, 333 Or. 135, 145, 36 P.3d 490 (2001) (quoting ORS 419B.504, in part). In addition, the court observed in Stillman that the focus of both parts of the test for determining a parent's unfitness
"is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or *80 condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child."
Id. at 146, 36 P.3d 490. The inquiry of whether a parent's conduct or condition has had a seriously detrimental effect on the child is meant to be "child-specific" and calls for "testimony in psychological and developmental terms regarding the particular child's requirements." State ex rel Dept. of Human Services v. Huston, 203 Or.App. 640, 657, 126 P.3d 710 (2006). For example, "minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities." State ex rel. SOSCF v. Wilcox, 162 Or.App. 567, 576, 986 P.2d 1172 (1999).
Importantly, the court in Stillman emphasized that a parent's fitness must be measured at the time of the parental rights termination trial. Evidence that grounds for termination may have existed at the time that the petition was filed, without evidence that those grounds continued to exist at the time of the trial, is insufficient to support the conclusion that a parent's parental rights should be terminated. Id. at 148-49, 36 P.3d 490. Finally, the court must also find that termination of parental rights is in the best interests of the child. ORS 419B.500.
The facts relied on to prove unfitness must be proved by the state by clear and convincing evidence, or admitted by the parent. ORS 419B.521(1). All proven conduct or conditions will be viewed in combination in determining whether a parent is unfit. See, e.g., State ex rel. Dept. of Human Services v. Radiske, 208 Or.App. 25, 49, 144 P.3d 943 (2006); State ex rel. Dept. of Human Services v. Rodgers, 204 Or.App. 198, 217-18, 129 P.3d 243 (2006); State ex rel. SOSCF v. Mellor, 181 Or.App. 468, 476, 47 P.3d 19 (2002), rev. den., 335 Or. 217, 65 P.3d 1108 (2003).
The central issue in this case  as the juvenile court and the parties have framed it  is whether, as a consequence of his drug dependency and mental health conditions, father was unfit at the time of trial. Father asserts that, "[g]iven his progress over the year before the trial, his willingness to seek assistance, and the ample evidence of his empathy and sensitivity to his children's needs, the state failed to establish by clear and convincing evidence that father is presently unfit to parent E and F." Father primarily relies on the Supreme Court's decision in State ex rel Dept. of Human Services v. Simmons, 342 Or. 76, 149 P.3d 1124 (2006). In Simmons, the Supreme Court reversed a judgment terminating parental rights that was entered by the juvenile court and affirmed by this court. As in this case, the state's case in Simmons was based on ORS 419B.504, and the asserted grounds of unfitness were the parent's substance abuse and mental health disorders.
Because a proper understanding of Simmons is critical to our decision here, we set out at length the court's dispositional analysis:
"As noted, the state alleged in its petition to terminate mother's parental rights in this case that the following `conditions' justified termination: (1) addictive or habitual use of controlled substances to the extent that her parenting ability is substantially impaired; (2) lack of effort or failure to maintain a suitable or stable living situation; (3) failure to present a viable plan for return of the child to mother's care; (4) an emotional or mental illness or deficiency of such nature and duration as to render mother incapable of providing care of the child for an extended period of time; (5) physical and emotional neglect of child; (6) lack of effort to adjust circumstances, conduct, or conditions to make return of the child possible; (7) failure to effect a lasting adjustment after reasonable efforts by available social services have been made; and (8) multiple medical needs that, coupled with mother's mental health and drug abuse problems, substantially impaired mother's ability to care for the child.
"At the outset, we observe that the fact that mother had maintained a suitable and stable living situation for well over a year by the time of the trial was undisputed. In addition, the state did not present any evidence that mother neglected the child either emotionally or physically. We therefore find that the state failed to prove *81 either of those grounds for termination by clear and convincing evidence.
"The remaining allegations boil down to the following: that mother is unfit because her history of drug abuse, her personality disorder, and her physical illness, either alone or in combination, constitute a `condition' of the kind that may justify termination of her parental rights if we find it to be seriously detrimental to child.
"A parent's history of drug abuse, if it has been addressed successfully by the time of the termination trial, is not a `conduct or condition' that necessarily renders a parent unfit at the time of that trial. Stillman, 333 Or. at 148, 36 P.3d 490. As noted, at the time of the trial in this case, mother successfully had completed four levels of drug treatment and a 12-step program. She had been clean and sober for 20 months; no witness even hinted that mother might have been abusing her medications after February 2002. And, according to Cross, mother had been growing ever stronger in her recovery. On this record, there is not clear and convincing evidence of a present drug abuse problem that would render mother unfit at the time of the termination trial.
"Notwithstanding mother's success in treating her drug problem, the Court of Appeals found a `real and present risk of relapse' based on mother's `persistent dishonesty and denial about her addiction.' However, there is ample evidence in the record that, by the time of trial, mother had admitted that she was an addict, that she understood that she would always be in recovery, and that she continued regular counseling with Cross and her pastor to address that issue. The fact that mother lied about the recency of her last abuse of OxyContin and continued to deny in court that she ever had used methamphetamine does not undercut the evidence of mother's undisputed success in the 20 months before the trial in remaining clean and sober, and it does not, in itself, reflect on mother's fitness or ability to care for child. See [State ex rel. Dept. of Human Services v.] Smith, 338 Or. [58,] 85-86, 106 P.3d 627 (2005) (in absence of clear and convincing evidence that mother's tendency to lie and tell outrageous stories is seriously detrimental to child, mother's untruthfulness not grounds for termination). The Court of Appeals erred in not focusing on the pertinent time frame. We find that the record does not contain clear and convincing evidence of a serious risk of relapse, such as to constitute a `condition' that might render mother unfit.
"We also do not view mother's physical illnesses as a condition that might justify termination. By the time of trial, and for at least a year before that, the undisputed evidence was that mother was much healthier than she ever had been before. Indeed, the trial court found that, by the time of the trial, mother had been able to take care of herself and her home without the assistance of others.
"Finally, Sweet diagnosed mother with an unspecified personality disorder with borderline, dependent and narcissistic features, and Condon's findings, although not resulting in a diagnosis, were not inconsistent with Sweet's. Both psychologists found that mother was inflexible, over-controlled, self-centered, and overly desirous of appearing in a positive light. Sweet testified that that personality disorder would interfere with mother's ability to interact with others and to place child's needs above her own. We agree that mother's personality disorder is a `condition' of the kind that may justify termination under ORS 419B.504, if there is clear and convincing evidence that that condition is seriously detrimental to child.
"Our de novo review of the record shows the following evidence concerning the effect of mother's `condition' on child: Immediately after child was removed from mother's care, child was anxious and upset and suffered post-traumatic stress over having witnessed mother's drug abuse and having been unable on occasion to wake mother up, leading her to worry that mother would die, and over having witnessed repeated, loud arguments between mother and [mother's sister]. At that time, child also was irritable, angry, and defiant. Witnesses agreed that child was `parentified,' insofar as she was inordinately worried *82 about her mother's welfare and felt herself to be responsible for her mother. She began to wet the bed at night and wet herself occasionally during the day. In her play, child exhibited a fear of abandonment.
"By the time of the trial, however, child was relatively happy and well adjusted. She had friends and did well in school, and her enuresis was resolved. Portland, who had met with child three times in the weeks before the termination trial, testified that she had seen marked improvement in child's behavior and outlook during the time that child was in foster care. According to Portland, child `is happy. There's sparkle in her eyes. She has friends she cares about. * * * Emotionally, she can talk about her feelings, negative and positive.' And, with respect to child's `parentification,' child's therapists had addressed child's feelings of responsibility for mother together with mother, mother has accepted responsibly for the problems, and child now knows that mother loves her and that she is not responsible for mother.
"Portland also testified, however, that child continues to display an inability to trust others and a tendency to tell others what she thinks they want to hear. Finally, the record reflects that, immediately before the trial in this matter, child was beginning to be inattentive and was showing off and disorganized at school, although Portland acknowledged that those behaviors likely were brought on by anxiety related to the impending proceeding.
"With respect to mother's interactions with child, virtually all witnesses agreed that mother and child love each other very much and that mother and child were extremely loving and affectionate with each other during visitations. Mother played with child, brought age-appropriate activities to the visits, brought and prepared nutritious meals for child, read child books, and disciplined child appropriately as necessary.
"The state's chief criticisms of mother were that she did not fully appreciate the harm that child had suffered from witnessing mother's drug abuse and arguments with [mother's sister] and that mother was not able to put child's needs above her own. As to the former point, there is evidence in the record that, soon after child was removed from mother's care, mother minimized child's fears and attempted to force contact with [mother's sister]. The record does not support a finding, however, that that attitude persisted after mother stopped abusing drugs and began her recovery in earnest in February 2002. The evidence in support of that latter point included the following: (1) mother believed that child's worries for mother's well-being showed child's compassion and were not problematic; (2) mother disregarded child's wishes on a number of occasions, including not permitting child to cut her hair, giving a puppy a name different from the one child preferred, and writing a message to child in sidewalk chalk in spite of child's request that she not do so; and (3) mother brought presents and played with child during visits rather than talking about the family issues.
"The foregoing evidence of detriment to the child does not rise to the level contemplated by the legislature in ORS 419B.504 so as to provide a basis for concluding that mother is unfit. Child's problems, such as they continue to exist, do not appear to us to be severe; all agree that child presently is generally happy and well adjusted. And mother's behavior before the termination trial, during the period of her recovery, while not exemplary in every respect, was mainly positive and appropriate. During visits, mother consistently was loving and appropriate toward child and child freely hugged and kissed mother and told mother that she loved her. Additionally, there is no evidence in the record that child ever was harmed or in danger during that period. As this court stated in Smith, 338 Or. at 87, 106 P.3d 627, perfection in parenting is neither attainable nor required.
"None of the evidence that the state presented pertaining to mother's parenting after child was removed, and particularly after mother began her recovery in earnest in February 2002, shows clearly and *83 convincingly that mother's parenting is so inadequate as to be seriously detrimental to child, thereby justifying termination of mother's parental rights. Certainly, there is no clear and convincing evidence that such was the case at the time of trial. Again, as in Smith, the state is attempting to impose a standard of parenting on mother that the statute does not contemplate. Smith, 338 Or. at 87, 106 P.3d 627. Based on the foregoing, we conclude that the state has failed to show by clear and convincing evidence that mother is unfit under ORS 419B.504. It follows that the trial court order terminating mother's parental rights was error, as was the Court of Appeals decision affirming that order."
Id. at 98-103, 149 P.3d 1124 (emphases in original; footnotes omitted).
It would be erroneously reductive to conclude that, merely because the court in Simmons focused on the mother's recent efforts to turn her life around in determining that she was not unfit, the court thereby meant to afford an indefinite number of opportunities for parents with serious substance abuse and mental health conditions to engage in cycles of treatment, relapse, and recovery while their children remain in the foster care system. Such a conclusion misses two critical factors that were at play in Simmons and that are missing here. First is the nature of the relationship between the parent and the child and the degree to which they are bonded. Simmons involved a child who was eight years old at that the time of trial and who had lived with  and become fully bonded with  her mother from the time of her birth until she was six, when the state first removed the child to foster care. By contrast, the children in this case have been in the foster care system for most of their lives, and neither has lived with father for more than sporadic periods of time.
Second, and more importantly, the children in this case have serious emotional problems that would be dramatically exacerbated by their removal from the foster family that they have come to regard as their own. Borg testified without meaningful rebuttal that, if F were returned to father, F would likely "grieve the way a child who loses his or her parents grieves." With respect to the possibility of E returning to father's home, Borg opined that he
"would expect a regression in whatever gains she has made over time in her current home * * * and that based upon the length of time she's been in that home and the services she's been getting, that she would go through at least the initial stages of grief associated with an attachment disruption, and that it would be at high risk  she'd be at high risk for never actually resolving those stages of grief and reattaching to someone else."
By contrast, the child in Simmons was well adjusted and happy at the time of trial. In short, there was far more reason in Simmons to believe that the mother could turn her life around: she was the primary parent figure for the child, and the child's emotional condition was good. Here, those circumstances do not exist, as the juvenile court's findings clearly and convincingly demonstrate.
As the court reiterated in Simmons, the unfitness inquiry necessarily focuses on the severity of the adverse effect of a parent's conduct or condition on the child. That is, the more adverse its effect on the child, the more likely it is that the parent's conduct or condition will render him or her unfit. In Simmons, the court relied heavily on its decision the previous year in Smith. In Smith, the court elaborated on the requirement in ORS 419B.504 that a parent's conduct be "seriously detrimental" to the child. That case involved a mother of low-average intelligence whose child was removed from her care at birth because of concerns that the mother was mentally ill. The state had alleged, among other things, that, in the years between giving birth to the child and the termination proceeding, the mother had made virtually no progress in developing parenting skills and never learned to interact with the child in any of the ways that DHS personnel thought necessary or appropriate. The state's chief complaints in that regard were that the mother failed to make her visits with the child enjoyable for the child, that the mother did not respond appropriately to the child's cues, that the mother refused *84 to read any of the parenting books provided to her, and that the mother lacked "insight" into the importance of the various skills that had been taught to her in the many parenting classes and sessions that the agency had provided her.
In evaluating the mother's conduct during the visits and any detrimental effect on the child, the court agreed that the mother's behavior was not optimal. Indeed, the court agreed that the "mother did not interact with the child at a level that would ensure that the child necessarily will experience maximum emotional development." Smith, 338 Or. at 87, 106 P.3d 627. Nonetheless, the court concluded that
"the deficiencies perceived here are not so severe as to implicate the standard that the statute sets out for the termination of parental rights and likely are no worse than those of thousands of Oregonians who ultimately succeed, without state intervention, in raising their children safely.
"Given mother's limitations, perfection in parenting is not attainable (if it is for anyone), but neither is it required. For more than two years, despite her recognized intellectual and social skills deficits, mother participated regularly in programs required by DHS and religiously attended weekly visits with the child. The testimony of DHS workers observing the visits confirmed that mother played with the child with toys, although she did not offer him a variety from among the wide assortment of educational toys available, and that the child went to mother willingly, laughed when mother took his picture, and clung to her when he felt frightened. The child never was injured or in any danger during her visits. And, the evidence was undisputed that mother had provided childcare for many children over the years with no complaints. In contending that, notwithstanding the foregoing, mother is so inadequate as a parent that her condition is seriously detrimental to the child, DHS has attempted to impose a standard on mother that the statute does not contemplate."
Id.
Again, the circumstances here are unlike those in Smith. The children here have special needs, they are healthily bonded with their foster parents, but not with father, and the issue is not whether father is minimally adequate in light of his intellectual deficiencies but, rather, whether, he has simply waited too long to reform in light of the children's pressing needs.
In addition, father relies on this court's decision in State ex rel Dept. of Human Services v. L.S., 211 Or.App. 221, 242-43, 154 P.3d 148 (2007). In that case, the dispute centered on whether the father had problems with anger and paranoia that had not been successfully treated. DHS relied on the father's history of violent behavior, a psychological evaluation, and the juvenile court's finding that the father's demeanor at trial demonstrated that he had not benefitted from anger management and domestic violence treatment. We understood DHS to contend, first, that the father suffered from an emotional illness or mental deficiency that made him incapable of providing adequate care for his child and, second, that the father had failed to effect a lasting adjustment in his anger problems that would allow the child to safely return home. We concluded that the evidence was insufficient to establish either basis for termination. Id. at 243, 154 P.3d 148.
Although there was evidence that the father had difficulties with anger, his anger and distrust toward DHS that was observed by the juvenile court and by the psychologist followed the father's experience of more than two years of participating in services required by DHS that did not seem to be bringing him any closer to reuniting with his child. We were not persuaded that his frustration with DHS evidenced a personality disorder or other condition that was detrimental to the child so as to render the father unfit. Moreover, there was no evidence that the father's anger toward DHS affected his interactions with the child. Relying on Smith, we concluded that "[h]ostility toward the agency, without more, is not evidence of conduct or a condition that is detrimental to B." Id. at 242, 154 P.3d 148; see Smith, 338 Or. at 84, 106 P.3d 627. Like father in this case, the father in L.S. actively *85 participated in and successfully completed services. In L.S., despite initial resistance, the father engaged in drug and alcohol treatment and anger management and domestic violence education programs. Id. at 243, 154 P.3d 148. He also displayed particular interest in improving his parenting skills, and he was able to identify lessons that he had learned from them. Id. We concluded that the father had made significant strides in his conduct and that the record did not contain clear and convincing evidence that he was unfit. Id. But significantly, unlike in this case, there was no compelling evidence in L.S. of detrimental effects of the parent's conduct or condition on the child.
Father also relies on State ex rel SOSCF v. Armijo, 151 Or.App. 666, 684, 950 P.2d 357 (1997), where the mother's "substantial efforts" as of the time of the termination hearing were the basis for reversing the judgment of termination. Armijo, like this case, involved a parent who suffered from mental illness and had a history of drug abuse. Id. at 668, 670-71, 950 P.2d 357. By the time of trial, she had completed a drug treatment program, was active in a faith-based treatment program, and had achieved 10 months of sobriety. Id. at 674, 950 P.2d 357. Although we recognized some uncertainty regarding whether the mother's changes were transitory or would survive long-term, that uncertainty indicated to us that the state had failed to prove, by clear and convincing evidence, that reunification was improbable within a reasonable time. Id. at 682, 950 P.2d 357. However, unlike in this case, the child in Armijo had no significant special needs at the time of trial. Here, the children will struggle with the effects of father's drug use and mental disorders for years to come, and they are presently at risk due to father's present inability to parent them.
Finally, father relies on State ex rel. Dept. of Human Services v. Squiers, 203 Or.App. 774, 126 P.3d 758 (2006), where we concluded that the mother's borderline personality traits did not interfere with her ability to recognize and meet her children's special needs. There, the two children both had learning difficulties, ADHD, and other special needs. Id. at 784-86, 126 P.3d 758. The children needed a consistent home environment where they would receive attention and stimulation, and they needed a caregiver who would be a strong advocate for them in the school system and expose them to educational materials at home. Id. at 784-86, 126 P.3d 758. At trial, the mother was able to persuasively articulate how she would address her children's learning delays and other special needs. Id. at 794, 126 P.3d 758. For example, she demonstrated an awareness of their need for repetition to assist in the learning process. Id. She testified that she would help them learn to communicate better by offering them choices and then teaching them about the consequences of those choices. Id. She stated an intention to work closely with everyone who worked with the children and to implement their suggestions. Id. Moreover, she had participated in a number of parenting classes that had helped her to understand appropriate levels of supervision for the children. Id. at 795, 126 P.3d 758. In sum, the evidence showed that, despite a personality disorder, the mother displayed insight and understanding regarding her children's special needs. Here, unlike the mother in Squiers, father did not provide any persuasive evidence that he currently is capable of addressing, or even meaningfully understanding, the children's conditions.
State ex rel. Dept. Human Services v. A.M.P., 212 Or.App. 94, 157 P.3d 283 (2007), a case that father relied on before the trial court and on which the trial court may have focused in concluding that father was not presently unfit, is also distinguishable. Although, as in this case, the parent in A.M.P. had a drug dependency and personality disorder and had made progress in treating those problems at the time of trial, the children in that case were doing well and apparently had no identified special needs. Id. at 102, 157 P.3d 283. For that reason, we concluded that the record "lack[ed] evidence that [the] mother's conduct and conditions were seriously detrimental to the children at the time of trial." Id. at 105, 157 P.3d 283 (emphasis in original). In that regard, we expressed our frustration that the record was "devoid of any evidence regarding the children." Id. at 106, 157 P.3d 283. As discussed, *86 the record regarding the children's needs and circumstances is very different in this case.
As the juvenile court found, father is currently in a cycle of sustained remission from his addiction, signifying at least one year's sobriety. He completed his last treatment requirements with substantial compliance and has moved into a community maintenance phase. At the time of trial, father irregularly attended support groups, periodically checked in with his most recent out-patient drug counselor, and was addressing relapse scenarios with his mental health counselor. The state produced no convincing evidence of drug use or regular association with individuals who were using drugs. In addition, he had obtained and maintained drug-free housing, completed a 10-week vocational program and gained  then lost  employment. Father was actively working in his recovery program. Those findings led the court to conclude that, even though father previously had had at least one year-long period of sobriety before and relapse remained a significant risk, his present unfitness based on substance abuse was not clearly and convincingly proved.
We respectfully disagree with that conclusion. This case is like Simmons, L.S., Armijo, Squiers, and A.M.P. in that father made significant progress in addressing his mental health and substance abuse problems in the months before trial. It may be, as father contends, that his cyclical history of addiction and relapse alone is insufficient to prove his present unfitness. However, father's drug dependency, when viewed in combination with his mental disorders and the children's special needs, rendered father presently unfit at the time of trial. Those conditions, which deprived the children of their father for most of their early childhood years, have also  except to a rudimentary extent  made him unable to adequately appreciate and accommodate the children's special needs. Despite his progress at the time of trial, father was still at least a year removed from being ready to parent the children.
As the juvenile court found, father has never had a significant bond with E, and she has not spent more than nominal time in his care. E's primary attachment is to her foster mother. Moreover, largely due to father's own drug use, he was historically unaware of E's mother's inadequate care of E, as well as incapable of providing appropriate care himself had he been interested or physically available to do so. It was that dynamic that contributed to E's multiple moves and caregivers, which in turn caused her attachment disorder. At the time of trial, father had not seen E in more than a year, when his visits were suspended due to E's regressive behaviors after parental visits. Father historically lacked the ability to provide for E's basic needs and, although he made recent limited efforts, while sober, to learn of her special concerns in his counseling, those efforts occurred outside the context of actual contact with E. As the juvenile court also found, "[E]'s problems * * * are so pronounced and the degree of insight, patience, and effective advocacy needed to address her attachment problems so great that it is likely [f]ather, for all the reasons detailed above, will never be able to meet those needs."
The situation is functionally identical as to F. F is a bright child and developmentally on track. Unlike E, he did not experience the multiplicity of moves as a toddler that severely undermined an ability to form attachments with caregivers. His primary and strong attachment is to his foster parents. He lived with his foster family as a toddler for several months in 2004 and 2005, and then continuously since November 2005 when the second attempt at reunification with father failed. F has a higher need for reassurance and stability than a child who has experienced consistency in caregiving. F does not want to live with father and has pronounced anxiety concerning the issue of his permanent placement. He has been diagnosed with an adjustment disorder attributed in part to delay in permanency and in part to his adjustment to living with E. F has been participating in counseling for more than two years. Adequate parenting for F requires significant psychological resources and a child-centered focus. F's needs would severely tax any parent, much less a single parent in recovery. Moreover, father is not ready to resume care. Several attempts to *87 place F with father have failed. As the trial court found, the evidence shows clearly and convincingly that F simply cannot wait.
Except in cases where the juvenile court initially finds that no further services are required, ORS 419B.470(2) gives the Department of Human Services no more than 12 months after a child is found to be within the jurisdiction of the court under ORS 419B.100, or 14 months after the child is placed in substitute care, whichever is the earlier, to conduct a permanency hearing. That statute evinces the specific policy objective that children not be left indefinitely in a placement limbo, and it also more generally reflects a child-centered policy orientation to the dependency process. At the time of trial in this case, two special needs children had been enmeshed in the child protection system for six and five years, respectively, and DHS had invested substantial resources in assisting father through multiple relapse and recovery cycles.
Unlike Huston, this is not a case where "the agency should have taken more [time]" to prepare father for the challenge of parenting these children. Huston, 203 Or.App. at 660, 126 P.3d 710 (Brewer, C.J., concurring). To the contrary, in this case, the "child-specific" testimony in psychological and developmental terms regarding the relationship between father's substance abuse and mental disorders and the special needs of E and F is compelling and essentially unrebutted. Unlike in Simmons, that evidence is not primarily confined to the probable effects of his very real risk of future relapse; instead, there is abundant evidence that, despite his more recent progress, father's conditions currently have (and have had) tangible detrimental effects on the children. That evidence is pertinent, not only to the issue of whether the children's integration into father's home is improbable within a reasonable time; it is also material to the issue of his present unfitness. Stillman, 333 Or. at 146, 36 P.3d 490. In light of that evidence, we conclude that the children and the state have proved, by clear and convincing evidence, that father is unfit by reason of drug dependency and personality disorders that, in combination, are seriously detrimental to these children. Moreover, for the reasons explained by the trial court, we conclude that the state and the children have proved by the same standard that integration of the children into father's home is improbable within a reasonable time due to conduct or conditions not likely to change and that termination of father's parental rights is in the children's best interests.
Reversed.
NOTES
[1] E and F have different mothers. The parental rights of both mothers have been terminated and are not at issue in this appeal.
[2] Deitch stated in his report that father used drugs during a break in his interview with father. At trial, father did not recall meeting Deitch, nor did he recall using drugs during the interview.
[3] Guiden's testimony was inconsistent with the opinions of the children's therapists, who testified that, although both children's conditions had improved with the stability and nurturing in their foster placement, they were still experiencing significant mental health challenges at the time of trial and would need to work on those issues for years to come. After Guiden testified, E's therapist was recalled as a witness. She testified that she did not tell Guiden that E's reactive attachment disorder had resolved, gone away, or words to that effect. Instead, the therapist testified that she told Guiden that such a diagnosis can resolve over time for children who are "stable and consistent." Both therapists' opinions were consistent with Borg's assessment of the children in March 2006 and his trial testimony. On de novo review, we find the testimony of Borg and the children's therapists to be credible.
[4] The state asserted additional grounds of unfitness before the trial court. However, the trial court rejected those assertions, and the state does not renew those assertions on appeal. Accordingly, we do not consider them.
[5] It appears likely that the trial court was referring to three appellate decisions that father's attorney cited in her closing argument: State ex rel. Dept. of Human Services v. Simmons, 342 Or. 76, 96, 149 P.3d 1124 (2006); State ex rel. Dept. of Human Services v. A.M.P., 212 Or.App. 94, 157 P.3d 283 (2007); and State ex rel Dept. of Human Services v. L.S., 211 Or.App. 221, 154 P.3d 148 (2007). We discuss each of those decisions in our own analysis below.