209 P.3d 817 (2009)
228 Or. App. 700
In the Matter of A.L.S., Minor Child.
STATE ex rel DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
A.L.S., Appellant.
7432J; A139698.
Court of Appeals of Oregon.
Argued and Submitted January 16, 2009.
Decided May 27, 2009.
*819 Steven C. Smith, Portland, argued the cause and filed the brief for appellant.
Inge D. Wells, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
ORTEGA, J.
Mother appeals a judgment terminating her parental rights to her now five-year-old daughter on the ground that she is an unfit parent. ORS 419B.504. Because child has no legal father, only mother's parental rights are at issue. On appeal, mother and the Department of Human Services (DHS) disagree about whether mother, who has a long history of substance abuse with periods of sobriety, has adequately resolved her problems with substance abuse despite evidence that she consumed alcohol on four occasions shortly after participating in treatment for the eighth time. We review de novo, State ex rel Juv. Dept. v. J.L.M., 220 Or.App. 93, 95, 184 P.3d 1203, rev. den., 345 Or. 158, 190 P.3d 379 (2008), and, for the reasons that follow, affirm.
We begin with a brief overview of the pertinent facts. Mother, who was 23 at the time of the hearing, has abused drugs and alcohol since she was eight. Since 1997, mother has participated in at least eight substance abuse treatment programs and, after intermittent periods of recovery, has relapsed on numerous occasions. As pertinent here, a 2006 psychological evaluation diagnosed mother with polysubstance dependence, major depression, and post-traumatic stress disorder. Mother was evaluated by two psychologists in 2008. Although both agreed that mother no longer suffered from depression or post-traumatic stress disorder and that she continued to suffer from polysubstance dependence, they disagreed about whether her condition was in remission.
Child had spent over half of her life in foster care by the time of the April 2008 termination hearing. She was born in October 2003 and was first removed from mother's care in September 2004, one month shy of her first birthday. Two months later, child was returned to mother's care and remained with mother until November 2005, when, at age two, she was again removed. Child was returned to mother again around the time of her third birthday in October 2006 and lived with mother for two months before being removed again. Child has been in foster care since January 2007. Each of the three times she was removed from mother's care, she was moved to the same foster family (cousins of mother's), but, because that family ultimately was not able to be an adoptive placement for child, child experienced an additional placement change to her current foster family (also relatives of mother's) in March 2007.
In June 2007, mother was jailed following repeated probation violations. During her incarceration, mother completed substance abuse treatment and, as confirmed by several urinalyses, did not use drugs during the year preceding the hearing in this matter. However, weeks after completing treatment and being released from jail in October 2007, mother consumed alcohol "four or five times" and, on the last occasion, did so to the point of intoxication.
We now turn to a more detailed examination of the facts. Because mother characterizes her recent one-year abstinence from drug use as a significant break from her previous history, we examine mother's history of drug and alcohol use and her efforts to treat that addiction. We then discuss mother's psychological evaluations and child's condition and needs.

I. HISTORY

A. Mother's history of drug and alcohol use and treatment

Mother, who was born in 1984, began using marijuana at age eight and, by the time she *820 was 12, was also using methamphetamine and alcohol. Mother's initial use of methamphetamine was limited to three occasions in 1996, but she began using it again two years later at age 14. In the meantime, she continued to use other drugs and, in 1997, at age 13, she entered an outpatient drug treatment program, her first occasion of treatment. Her drug use continued even as she participated in the program and, ultimately, she did not complete treatment. By July 2000, she was using approximately one gram of methamphetamine per day.
At that time, mother, who was then 15 years old, was in the custody of the Oregon Youth Authority because of truancy and delinquency matters relating to her drug use. At mother's request, her juvenile probation officer placed her in a residential treatment program (her second attempt at treatment and first instance of residential treatment) and, after she successfully completed that program in February 2001, she entered aftercare treatment at Renaissance Recovery Resources, Inc. At that time, mother's support network included her father and stepmother, her residential treatment counselor, and her sponsor. When mother was discharged from Renaissance in June 2001, her counselors rated her prognosis as "excellent," primarily because of mother's high motivation and her immersion in the local 12-step community.
Mother abstained from drug and alcohol use for nearly two years after that second treatment attemptbut, by January 2003, she was again using marijuana and alcohol. In June 2003, four months before child was born, mother's juvenile probation officer referred her to Renaissance for a third attempt at treatment as a final condition of her probation. Mother was not enthused about being in treatment, but was willing to "deal with it" in order to end her probation. During her intake interview, mother revealed that she was entering her sixth month of pregnancy and that, despite having stopped using alcohol since learning of her pregnancy, she had used marijuana in the previous two days. Mother reported that she primarily used marijuana when she was "stressed out" or "depressed." Mother reported that her friends and family supported her efforts to remain sober and that, as part of her relapse-prevention efforts, she attended church and participated in various Narcotics Anonymous (NA) activities.
Child was born in October 2003, one month before mother completed her third round of treatment (the second at Renaissance). At discharge, mother had been clean and sober for 90 days, and her discharge summary rated mother's prognosis as "fair."
In June 2004, after approximately 10 months of sobriety, mother relapsed and began using marijuana. According to mother, her use was "sporadic," and she estimated that she used marijuana three to five times between June and mid-September 2004.
DHS became involved with the family in September 2004 after mother and child were treated for injuries sustained in a car accident. Although mother told hospital staff that she had fallen asleep at the wheel, they became concerned after mother's toxicology screen tested positive for marijuana and methamphetamine. They called DHS after mother took child, who was being evaluated for possible eye damage, from the hospital against medical advice. A DHS caseworker took child into protective custody and placed her with one of mother's cousins.
During a meeting with the caseworker the following day, mother acknowledged that she had used marijuana on the day of the accident but denied having used methamphetamine, though she admitted having done so several days earlier. In the resulting case plan, mother agreed to undergo a drug and alcohol assessment and to follow through with any treatment recommendations based on that assessment. The assessment noted that mother used marijuana to cope with depression and with other life stressors. As a result, the assessment counselor recommended that mother participate in outpatient treatment, provide clean urinalyses, and seek mental health treatment.
Based on that recommendation, mother entered treatment for a fourth time, beginning outpatient treatment at Serenity Lane in October 2004. Having recently learned that she was pregnant, mother was eager to end *821 her addiction, and her progress through the program was positive. Although she missed several counseling sessions, those that she did attend were productive. Mother involved herself in a support group through the church that she attended with her grandparents, began working with a sponsor, and, as demonstrated by two negative urinalyses, abstained from drug use. As a result of mother's progress, child was returned to mother's care in November.
During her treatment at Serenity Lane, mother reported that both her grandfather and her sponsor would be part of her support system and that, in order to avoid relapse, she would continue to participate in two 12-step meetings per week. When mother was discharged into recovery support in November, her counselor noted that mother no longer seemed depressed, that she was internally motivated to change, and that mother had "dedicated herself to recovery."
In fact, mother relapsed around that time. At the termination hearing, mother admitted that, shortly after child was returned to her care, she began using methamphetamine. In March, a urinalysis revealed that mother was again using marijuana. Mother's counselors often found it difficult to maintain contact with mother who, during that period, changed residences at least four times. Mother continued to participate in recovery support, but her continuing drug use, excessive absences from counseling sessions, and failure to maintain contact with her counselors were obstacles to her recovery. In May 2005, Serenity Lane terminated mother's participation in recovery support, citing, among other reasons, her continuing drug use and poor attendance. Mother's counselors advised her to seek residential treatment and suggested several appropriate facilities. However, mother resisted that idea and sought second opinions from two other treatment facilities, then failed to act on the recommendations that she received from either treatment facility.
In June, about a month after mother was terminated from Serenity Lane recovery support, her DHS caseworker, Bohne, held a family decision meeting with mother to discuss DHS's concerns about mother's continuing drug use and her unstable lifestyle. At the time, mother was expected to soon give birth to her second child, and Bohne told her that, if she maintained stable housing and the baby was born substance-free, DHS would not remove the baby from mother's care. Mother agreed to a new case plan in which she would reenroll in substance abuse treatment, including, if necessary, residential treatment, and would follow through with the program's recommendations.
Mother gave birth one week later. Because the child, K, did not test positive for any substances, she was not removed from mother's care. For a brief period after K's birth, mother adequately cared for both children and, although DHS continued to have concerns about the stability of mother's living arrangements, in October, the agency moved to end the juvenile court's wardship of child.
However, before the court could consider DHS's motion, concerns about mother's drug use resurfaced. In November 2005, the agency conducted an unannounced morning home visit. When an unidentified male opened the door, Bohne observed child walking around and saw an open bottle of liquor within child's reach. The living room and kitchen were littered with empty beer cans and there were at least two cases of alcohol present. Mother admitted to having recently drunk a wine cooler and used marijuana, but denied having used other substances. However, Bohne observed that mother exhibited physical signs of methamphetamine use and, as a result, she collected a urine sample, which later confirmed recent use of marijuana and methamphetamine. Following the home visit, DHS referred mother for additional drug and alcohol treatment.
Mother's family members also reported to DHS their heightened concern about mother's drug use and its effect on her children, and, at the family's request, a family decision meeting was held in early December. During the meeting, mother's family members informed her that they had secured a spot for her at Milestones, a residential treatment facility where mother could care for her children while she participated in treatment. Mother agreed to seek treatment there, and DHS, in turn, agreed to pay the initial treatment *822 costs and not to petition the juvenile court for custody of the children while mother participated in treatment. One of mother's relatives agreed to transport mother and the children to Milestones several days laterbut when the relative arrived to pick them up, mother and the children were not there.
The cousin who had previously provided foster care to child learned that mother had left the children in the care of K's father, because he left the cousin a voicemail message asking her to retrieve the children. When the cousin arrived at K's father's residence, she learned that he had left both children (an infant and a toddler) home alone. DHS took both children into protective custody.
The juvenile court held a review hearing in late January 2006. Mother appeared at the hearing and, although mother denied any drug use, Bohne later testified that mother's physical appearance suggested that she had been using drugs. After the hearing, and at Bohne's request, mother submitted a urine sample. Mother admitted that the sample would be positive for alcohol, methamphetamine, and marijuana, but, because the sample leaked during transport, there was no confirmation of mother's statements.
Shortly after that court hearing, the juvenile court relieved DHS of its obligation to provide services and ended mother's visitation with the children, to be resumed only after she completed substance abuse treatment, participated in a parenting class, maintained regular contact with DHS, complied with a urinalysis schedule, and demonstrated that she could maintain a stable lifestyle. Nevertheless, the agency continued to provide services and referred mother for a psychological evaluation, to a parenting class, and for assistance in obtaining residential treatment. Although mother did not follow through on the parenting class referral, in February 2006 she did participate in a psychological evaluation with Dr. Sweet, a licensed psychologist.
As pertinent here, Sweet diagnosed mother with polysubstance dependence, depression, and post-traumatic stress disorder, and a personality disorder not otherwise specified with characteristics of borderline and dependent personality disorders.[1] In Sweet's view, mother's drug use was related to her depression and stemmed from her desire to "numb herself." Because mother had not been able to maintain sobriety with outpatient drug treatment, Sweet considered it "critical" that she participate in an inpatient drug treatment program, preferably one that was equipped to help her deal with her depression and anxiety. Sweet opined that, in the long term, mother would need to demonstrate that she could maintain a good support network in the community, that she could maintain her sobriety, and that she could obtain employment and maintain adequate housing for herself and her children.
In late April 2006, two months after meeting with Sweet, mother entered residential treatment at Cascadia, her fifth attempt at drug treatment and her second attempt at residential treatment. Initially, mother was eager to undergo treatment and told the assessment counselor that she would not let "anything be a barrier" to her recovery. Less than two weeks later, mother left treatment because she believed that other patients were targeting her and that she was being unfairly disciplined.
Several weeks after leaving Cascadia, mother entered residential treatment at Milestones, her sixth attempt at treatment and her third attempt at residential treatment. Initially, mother was "engaged" and "motivated to be involved with * * * residential treatment" and progressed well through the program. Mother gained some insight into her relapse triggers and, on one occasion, alerted her treatment group to her desire to consume intoxicating substances. During the program, mother told her counselors that this was the first time that she had sought treatment for herself. Mother also participated in a 12-step program three *823 times a week and maintained contact with her sponsor. As a result of those positive reports, the juvenile court reinstated mother's visitation privileges and, two months later, acting on DHS's recommendation, returned both children to mother's care on the condition that she complete treatment at Milestones.
Initially, mother responded well to reunification. Soon, however, Milestones's staff observed that mother seemed to be "struggling with the responsibility of having both of her girls" at the facility full time. On one occasion, mother and the children visited a local library and, although the children were pulling books from the shelves, mother did not stop them and was resistant to her parenting counselor's feedback.
At the same time, mother's compliance with the facility's rules deteriorated. Mother was disciplined several times in November and December after her counselors learned that she had been dishonest about her whereabouts and the number of 12-step meetings she had attended in a particular week. After being disciplined shortly before New Year's Eve 2006, mother became upset, took the children, left the facility, and placed both children in K's father's care.
When Bohne learned that mother had left Milestones, she contacted mother, reminded her that, during the holiday season, recovering addicts often find it difficult to remain sober, and advised her to return to Milestones immediately. When mother attempted to return to Milestones the next day, however, her counselors were unwilling to allow her to return. She was ultimately discharged after she admitted that, although she was willing to return "for [the] courts," she did not want to be there. Mother began using alcohol, marijuana, and methamphetamine shortly thereafter. Following mother's unsatisfactory discharge, DHS took child into protective custody and again placed her in the care of mother's cousin. K remained in the care of her father.
Following a review hearing in January 2007, the juvenile court ordered mother to complete residential treatment. At the same time, DHS began preparing for termination of mother's parental rights. In February, DHS held a family decision meeting with mother and her relatives to determine a suitable adoptive resource because mother's cousin, with whom child had been placed, would be moving away from Oregon and could not serve as an adoptive resource. Another family, also relatives of mother's, agreed to serve as an adoptive resource. During the meeting, mother, who had been sentenced to probation in 2005 following her conviction on theft charges, revealed that an arrest warrant had been issued for her stemming from probation violations. Mother turned herself in to authorities shortly after the meeting. Several weeks later, the juvenile court approved the change in child's permanent plan to adoption.
Following her arrest, mother was offered the opportunity to participate in drug treatment in lieu of being sentenced to jail. Mother accepted and, in March, she entered residential treatment at the Alcohol Recovery Center (ARC), her seventh attempt at treatment and her fourth attempt at residential treatment. Less than one month after entering ARC, however, mother left the program, explaining to the staff that she had "nothing more to learn and [knew] how to stay sober." In late May, mother's probation was revoked after she was convicted of theft and possession of controlled substances. She was sentenced to 10 months' jail time after she declined to return to treatment and told the sentencing court that she was "not interested in any further treatment."
Despite mother's earlier reluctance to undergo further drug treatment, during her incarceration, she enrolled in intensive outpatient treatment at Creekside Counseling, her eighth treatment attempt. Once again, mother was eager to undergo treatment, explaining that, although she had previously engaged in treatment for her children, she would now do so for her own wellbeing. Mother expressed a desire for help in acquiring techniques to help her remain sober. She completed treatment shortly before her release from jail in October 2007 and, although the treatment records are sparse, it appears mother participated in relapse-prevention treatment and developed a relapse prevention plan. Mother also engaged in *824 community-based self-help groups and began working with a sponsor. Following her release from jail, mother was placed on post-prison supervision until October 2008 and, as a result, could not possess or use intoxicating beverages.
At the time of the termination hearing, mother had received one sanctionfor the consumption of alcoholduring her time on post-prison supervision. Shortly after mother completed treatment at Creekside, her DHS caseworker and her probation officer discovered pictures of mother, posted on her MySpace page, at a bar with a drink in front of her, apparently "partying" with friends. When she was first questioned about this by her probation officer, mother denied having used alcohol but, after being told that there was evidence of her use, mother admitted that she had twice consumed alcohol during the month following her release from jail. Mother explained that she had gone to a different county specifically in hopes that she would be less likely to be caught drinking. In the final Citizen Review Board hearing before the termination hearing, mother told the board that she had recently relapsed with alcohol. With the exception of mother's later admission, at the termination hearing, that she drank alcohol "four or five times" during the two months following her release from jail, there is no other evidence that mother has used drugs or alcohol since leaving Creekside. None of the six urine samples that mother submitted to her probation officer after her release tested positive for any substances.
Since her release from jail, mother has had several different residences. Mother first moved in with her mother, a recovering alcoholic whom she had previously identified as a relapse trigger. Mother then lived with a boyfriend for approximately one month before spending "two or three months" in a studio apartment behind her father's house. One month before the termination hearing, mother moved in with her grandparents, whose apartment consists of a loft (where mother lives) and a bedroom. Mother did not pay rent at any of those locations.
Mother is currently in her first year at community college, where she maintains a "B" average. She plans to attend a four-year college and study American Sign Language. Although mother was not employed at the time of the termination hearing, in the months following her release from jail she had worked at a fast food restaurant and, after being forced to leave that job because of transportation difficulties, worked as a telemarketer before she was dismissed for failing to meet donation quotas. Mother's sole sources of income at the time of the termination hearing were financial aid and educational loans.

B. Psychological evaluations of mother

In January 2008, three months before the termination hearing, mother consulted a psychologist and parenting teacher, Dr. Johnson. Johnson concluded that mother suffered from polysubstance abuse disorder, but concluded that mother's condition was in remission because she had not used illicit drugs in nine months, was no longer using alcohol, and was attending weekly 12-step meetings. Johnson recommended that mother continue attending meetings, working with a sponsor, and participating in her grandparents' church, where she could receive support as she recovered from her polysubstance disorder. Ultimately, Johnson concluded, based on his diagnostic interview and psychological testing, that mother would make a good and safe parent for child.
Several weeks later, mother participated in a second session with Sweet. During the evaluation, mother attributed her alcohol use in late 2007 to living with her mother and to her own belief that alcohol was not a problem for her. Mother admitted that she had been mistaken in that view and indicated that she was no longer living with her mother and was participating in 12-step meetings, all of which Sweet acknowledged were positive steps. Nevertheless, given mother's extensive participation in alcohol and drug treatment, Sweet was concerned that mother had not internalized the lessons she had surely been given in treatment regarding the use of alcohol and believed that mother's recent alcohol use raised questions about her future ability to remain clean and sober. Ultimately, he estimated that, given mother's history, *825 18 to 24 months of sobriety would be required to support a determination that mother could maintain a sober and stable lifestyle. He recommended that mother continue with drug and alcohol treatment and that, at a minimum, mother involve herself in a support group and work with a sponsor.
One month before the termination hearing, mother began receiving services at Lakepoint Community Care, a facility that provides drug and alcohol support. At the time of the termination hearing, mother was participating in counseling, aftercare treatment, and a 12-step meeting twice a week. Mother was also working with a sponsor with whom she spoke daily and met at least once per week and had done so consistently since her discharge from Creekside.
At the termination hearing, Johnson emphasized his view that "families are to be together" and that DHS's "function * * * is to reunite families, not to tear them apart." He reiterated his belief that, given mother's engagement in her recovery and the duration of her sobriety, her current recovery materially differed from her previous attempts. Although Johnson acknowledged that mother had used alcohol on a few occasions in the months before trial, he characterized those incidents as "lapses," which occur when a person who suffers from a substance dependency uses an intoxicating substance one to three times. He distinguished a lapse from a "relapse," which he characterized as a situation in which a substance-dependent person returns to her "active addiction on a daily basis over an extended period of time, without any attempt to stop." According to Johnson, although mother had lapsed, a lapse alone did not mean that her polysubstance dependence was not in remission. Rather, he opined, it was also necessary to examine mother's program of recovery, including her active engagement in her recovery program, her continued attendance at support meetings, her progress in school, and her overall support system, in order to determine whether mother was in remission. Johnson added that, given mother's overall progress, she deserved an opportunity to parent child.
Mother's grandfather, a certified drug abuse counselor, concurred with Johnson that mother's occasions of alcohol consumption in November and December 2007 constituted "lapses." According to mother's grandfather, because mother had not returned to daily consumption of drugs and alcohol, she had not relapsed. Mother's grandfather testified that, despite her lapses, mother had made a "remarkable effort" at recovery, noting that she regularly attended a drug and alcohol class, NA meetings, and church. He also testified that mother's support system extended past her family and included her sponsor, an accountability partner, and her counseling sessions. Although mother's grandfather acknowledged that there was no way to know whether mother would return to her addiction, he, like Johnson, believed that mother's engagement in her overall recovery program would allow her to do what was necessary to succeed. Mother's sponsor was also enthusiastic about mother's prospects for recovery and testified that, based on mother's support system and her efforts to associate only with persons also in recovery, she was "willing to bet" that mother would remain clean.
In contrast, Sweet disagreed with Johnson's opinion that mother's polysubstance dependence was in remission. Sweet testified that, because mother had used alcohol, a mind-altering drug, within the previous six months, her polysubstance dependence remained active and was not in remission. According to Sweet, although a person who remains clean and sober for 12 months is formally considered to be in full remission for purposes of the diagnostic manual (the DSM-IV), in most cases, recovery is incomplete as a practical matter until a patient remains sober for 18 to 24 months outside of treatment. In Sweet's view, mother's use of alcohol shortly after completing treatment demonstrated that treatment had not been successful and that it was necessary for her to return to treatment in order to learn new sobriety techniques. After considering mother's history of recovery and relapse, Sweet opined that mother would need to demonstrate a longer period of stability in order for him to be comfortable concluding that she was stable enough to parent child. He acknowledged that, to some extent, relapses *826 may be a natural part of the recovery process, but noted that, where children are involved, relapses are more problematic because children need permanency and cannot wait through extended episodes of relapse and recovery.
At the termination hearing, mother acknowledged that she would always be an addict but testified that she did not believe that she needed any further substance abuse treatment. She reported that she had "gotten enough treatment over the years" and knew what she had to do to "stay clean" and that she just needed to apply what she had learned. Shortly before the termination hearing, mother participated in a parenting seminar led by Johnson. The seminar's goal was to help parents do what is necessary to raise children in a healthy, functional home. Mother found the seminar to be helpful and reported that, if child were returned to her, she would implement what she had learned in the seminar. Although mother agreed that child needs permanency, she disagreed with the view expressed by two of child's therapists, addressed below, that it was not in child's best interests to experience any further changes in placement.

C. Child's condition and needs

We turn to the evidence regarding child's condition and needs. Testimony from child's health care providers indicates that child suffers from several mental and physical ailments that are exacerbated by stress and anxiety. Child, who was four and one-half years old at the time of the termination hearing, has been diagnosed with an adjustment disorder with anxiety and currently receives medical care for methicillin-resistant staphylococcus aureus (MRSA) (a skin condition characterized by painful boils) and epilepsy. Although treatment has ameliorated some of child's attachment issues, the experts who testified continue to be concerned about how any further disruptions will affect her physical and psychological health.
As noted above, child was initially placed in substitute care with mother's cousin, to whom she was bonded and called "Mama Toby." However, because mother's cousin could not be an adoptive resource for child, another family was chosen as the prospective adoptive resource and, in February 2007, DHS referred child to Dr. Eastman, a clinical psychologist, for an evaluation to determine the most appropriate permanency plan. Eastman diagnosed child (then age three) with an adjustment disorder with anxiety and noted that child had "significant" developmental delays in her cognitive, verbal, and nonverbal functioning. Eastman attributed child's "anxiety and regressive behavior" to her history of disrupted placements. Eastman concluded that child needed a permanent placement immediately and recommended that any further upheavals be limited in order to give child the chance to stabilize emotionally. Eastman cautioned that, without that opportunity, child's cognitive development was at risk and child was in danger of developing a severe anxiety disorder or significant psychopathology. As a result, Eastman recommended that DHS take certain steps to effectuate a smooth transition to placement.
Although DHS attempted to follow Eastman's recommendations, mother's cousin's moving schedule required the agency to accelerate the pace of the transition, and child was moved to the new foster family in March 2007. Child bonded quickly to her new foster fatherwhom she calls "Dad"but there was some concern that she would not attach to her new foster mother. In response to that concern, as well as concerns about child being behind in motor skill development, speech, and language, and about her aggression toward animals and other children and her "indiscriminate[ ]" friendliness with strangers, child began working with Occhipinti, a child and family therapist.
As noted, child suffers from MRSA, a recurrent skin infection that can be triggered by illness or stress. MRSA sufferers develop boils on different parts of their body; if not treated with antibiotics, the boils can become painful and enlarged, eventually necessitating lancing. As a result of her condition, child's skin must be surveyed during each bath and, if any bumps are discovered, she must be placed on antibiotics immediately, *827 before the bumps enlarge.[2]
Child also was diagnosed with focal onset epilepsy in January 2008 after her foster mother noticed that, after visits with mother, child frequently stared off into space and was unresponsive. Child currently requires medication twice per day. Although she does not suffer grand mal seizures, she must take medication for the rest of her life in order to prevent any worsening of her symptoms. Because epileptic seizures can by triggered by stress, child's pediatrician, Dr. Palm, testified that child needs structure and routine and will need regular doctors' visits, especially if her seizures worsen.
Dr. Kao, a pediatric neurologist, testified that child had been on antiseizure medication for approximately two weeks as of the termination hearing and that it would be necessary to monitor the frequency of the seizures as her medication was increased in order to determine whether any adjustments were necessary. Kao also indicated that, if child were to suffer a grand mal seizure, it would be necessary to take certain steps such as timing the seizure, determining whether child had suffered a respiratory compromise, and deciding whether 9-1-1 should be called. In order to provide an accurate report of child's seizures and frequency, child's caretakers would have to be good observers and would have to be reliable in giving child her medications. Kao estimated that, as child's treating neurologist, she would expect to see child every four to six months and receive periodic telephone updates. At the time of trial, child's seizures were not yet under control, a process that Kao estimated might take six more months.[3]
Overall, by the time of the termination hearing, child had made an "incredible amount of progress" since she began working with Occhipinti, progress that Occhipinti attributed to having a "stable environment" and "consistent parents." Child had bonded to her foster family, including her foster mother and her foster brothers. Moreover, although child continued to have difficulties maintaining appropriate boundaries with strangers and still occasionally displayed aggression and anxiety, she more often appeared to be anxiety-free.
According to Occhipinti, although child's difficulties in forming attachments had decreased, child was in a critical period in her development and, if moved again, was at a "great risk of developing an attachment disorder." Eastman, who evaluated child a second time two months before trial, agreed with Occhipinti's assessment, explaining that child's history of disruptions placed her at high risk for developing anxiety and attachment disorders that could adversely affect her ability to form appropriate relationships in the future. Occhipinti explained that girls with unresolved attachment issues are at risk for victimization in their later years. Ultimately, Eastman opined that, even a year before trial, child (who by that time had experienced three foster placements and two failed reunifications with mother) had already waited too long for a permanent placement and that child's emotional needs would not allow her to wait any longer to see if mother could sustain her recovery long-term.
Palm testified that, since child's placement with the current foster family, her MRSA flare-ups had decreased and that, although child had required antibiotics on several occasions since that time, she had not developed more than one boil at a time. Child had caught up on her developmental milestones, and her verbal functioning had improved. Palm noted that child had become attached to her foster family and that any change in child's placement could cause "flareups" with behavioral issues and would place child under stress, thus increasing her MRSA outbreaks and her seizure risk. Given the number of disrupted placements that child has endured, Palm was concerned about child's ability to handle more disruptions and opined that any further disruptions should be avoided. Palm, who had been child's pediatrician for three years, acknowledged that *828 mother's condition was "the best" he had ever seen her and that it appeared that mother was making the effort to remain sober. He noted also that mother, if sober, likely would be able to handle any setbacks that child suffered. Nevertheless, he explained that his "only concern" was the effect on child if mother relapsed.
Although child had regular visits with mother, there is little evidence about the progress of those visits around the time of the termination hearing. There is evidence that, in July 2007 (nine months before trial), child exhibited anxiety following a visit with mother, had trouble sleeping, and occasionally urinated on herself. At the termination hearing, mother testified that, when she visited with child, child was bonded to her. However, there is some evidence that, as late as February 2008, child was not well bonded to mother and referred to mother as her "visit mother."

II. DISCUSSION
Mother acknowledges her long history of recovery and relapse and concedes that, during her periods of relapse, she was not able to properly parent child. Mother also acknowledges that she has used alcohol since her most recent effort at drug and alcohol treatment but emphasizes that, at the time of the termination hearing, she had not used alcohol for four months. Moreover, she argues that those recent instances of alcohol use, which she characterizes as "lapses," should be viewed as a normal part of her recovery process. According to mother, her year-long abstinence from drug use and four-month abstinence from alcohol use, when viewed along with her participation in NA meetings, daily sponsor contact, and educational progress, all demonstrate that her current recovery is significantly different from her previous efforts. Mother contends that, even if child is returned to her and she again relapses, the evidence demonstrates that child has historically been able to handle transitions well and that, in the event of another disrupted placement, child would likely be able to adjust to the disruption.
DHS responds that it proved by clear and convincing evidence that, at the time of the termination hearing, mother's addiction rendered her incapable of caring for child. DHS contends that mother's 10-year history of cyclical recovery and relapse, as well as her inconsistent history of participation in treatment and 12-step programs and her consumption of alcohol shortly after completing her most recent treatment program, demonstrate that mother suffers from a substance abuse disorder that renders her unfit. DHS further argues that, in light of child's special needs, mother cannot provide the heightened degree of care that child needs. According to DHS, in light of evidence that child needs permanent placement immediately and that mother would not be ready to resume parenting for almost two years, a return to mother is not possible within a reasonable time. Finally, according to DHS, child's progress in her current placement, her immediate need for a permanent home, and mother's current inability to provide a safe home for child, all demonstrate that termination is in child's best interest.
We begin with the legal framework for termination. ORS 419B.504 provides, in part:
"The rights of the parent * * * may be terminated as provided in ORS 419B.500 if the court finds that the parent * * * [is] unfit by reason of conduct or condition seriously detrimental to the child * * * and integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"* * * * *
"(3) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"* * * * *
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child * * * to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after *829 reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
Thus, ORS 419B.504 requires a two-step analysis. To determine whether a parent is unfit, the court examines (a) whether the parent has engaged in conduct or is characterized by a condition and (b) whether that conduct or condition is seriously detrimental to the child. If the parent is unfit, the court must then determine whether it is improbable that the child will, within a reasonable time, be integrated into the parent's home. State ex rel SOSCF v. Stillman, 333 Or. 135, 145, 36 P.3d 490 (2001). In examining whether a parent is unfit, the inquiry focuses "on the severity of the adverse effect of a parent's conduct or condition on the child." State ex rel Juv. Dept. v. F.W., 218 Or.App. 436, 462, 180 P.3d 69, rev. den., 344 Or. 670, 189 P.3d 25 (2008). As a result, testimony about the child's psychological and developmental needs is required. State ex rel Dept. of Human Services v. Huston, 203 Or.App. 640, 657, 126 P.3d 710 (2006). The more adverse the effects of the parent's conduct or condition on the child, the more likely that the parent's conduct or condition will render the parent unfit. F.W., 218 Or.App. at 462, 180 P.3d 69. Whether or not a parent is fit is measured at the time of trial. State ex rel Dept. of Human Services v. Rardin, 340 Or. 436, 448, 134 P.3d 940 (2006). Evidence that grounds for termination may have existed previously, without evidence that those grounds continue to exist at the time of the hearing, is insufficient to support a conclusion that parental rights should be terminated. Stillman, 333 Or. at 148-49, 36 P.3d 490. Facts supporting termination must be proved by clear and convincing evidence, which is evidence that makes the existence of the asserted facts highly probable. ORS 419B.521(1); State ex rel Dept. of Human Services v. Radiske, 208 Or.App. 25, 48, 144 P.3d 943 (2006).
Here, we conclude that mother has failed to effect a lasting adjustment to her conductspecifically, her addiction to intoxicating substancesafter extensive efforts by DHS. Although mother completed a treatment program six months before trial, the state has proved by clear and convincing evidence that that treatment was not successful in resolving the problems resulting from mother's addiction. Mother admitted that, weeks after completing her eighth attempt at treatment, she consumed alcohol "four or five times"on the last occasion to the point of intoxicationand that she attempted to evade detection of her alcohol use. Undisputed evidence also shows that mother initially denied any use until being confronted with evidence of that use.
Clear and convincing evidence likewise establishes that mother has not taken the necessary steps to effect a lasting change. Mother has received numerous recommendations that she participate in residential treatment, both from treatment counselors and from Sweet. Mother's only long-term period of abstinence from drug use followed her completion of residential treatment in 2001 and, since 2007, mother has been under a juvenile court order to complete residential treatmentyet she has abandoned residential treatment and, more recently, has refused to participate in residential treatment. Although mother has said on occasion that she is willing to participate in any services offered to her, she nevertheless has expressed more than once that she has nothing more to learn from substance abuse treatment and now needs only to apply what she has learned previously.
Instead, mother has opted for outpatient treatment, a level of treatment that has historically proven inadequate to address her problems with substance abuse. Before 2007, mother participated in three outpatient treatment programs, successfully completing twobut neither was effective in enabling mother to maintain her sobriety long-term. On one occasion, mother returned to substance abuse around the time that she was being discharged from the program; on the other occasion, although mother was able to remain clean and sober for 10 months, she ultimately resumed marijuana use. Moreover, those incidents occurred despite mother's participation in weekly 12-step meetings, reliance on her sponsors and grandparents *830 for support, and, on one occasion, participation in aftercare treatment.
Although we commend mother's recent efforts, her conduct following her most recent attempt at outpatient treatment does not alleviate concerns that she will not be able to maintain sobriety long-term. As noted above, mother returned to alcohol use within weeks of her discharge from treatment. Although it appears that mother was in aftercare treatment at the time of the termination hearing, she did not begin participating in that program until one month before the first day of testimony. Before that, mother's recovery plans consisted of working with her sponsor and attending 12-step meetings  a program that, as we have noted, has previously been ineffective for mother. Even if we assume, as urged by Johnson, that mother's occasions of drinking shortly after completing treatment are typical of someone in recovery, those incidentswhether they are termed "lapses" or "relapses"raise concerns about the stability of her recovery, given her cyclical pattern of recovery and relapse.
More than three years after child, at age one, was first removed from her care because of concerns about her drug use, mother has not been able to sustain recovery and a stable lifestyle long enough to enable child to safely return home. Three years is beyond a reasonable time for this young child who has experienced so many placement disruptions.
We next consider whether mother's conduct is seriously detrimental to child. As this court recently explained in a similar case involving children who had been removed from the parent at a young age and had lived with the parent only for sporadic periods, where children in such cases have special needs and are healthily bonded to their foster parents, the issue is not whether a parent is minimally adequate, but whether the parent has waited too long to reform in light of the child's pressing needs. F. W., 218 Or. App. at 464, 180 P.3d 69. We conclude that that is the case here.
It is undisputed that child suffers from a seizure disorder, an adjustment disorder, and MRSA, all of which require that child be protected from stress. There also was expert testimony that, as of the year before the termination hearing, child was in a critical period of her cognitive and emotional development and required a stable placement immediately. Eastman expressed the view at the termination hearing that child, having spent that year in a stable placement with her current foster family, had already waited too long for a permanent placement. Other evidence indicates that any disruption of child's bonds with her current foster family, who are an adoptive resource to whom child is bonded, would cause a regression in child's development.
We next consider whether mother might be able to meet child's needs within a reasonable time. ORS 419B.504. A "reasonable time" is the period of time that is reasonable "given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20). Contrary to mother's argument, clear and convincing evidence shows that child cannot be integrated into mother's home within a reasonable time. Child's therapists testified that child's need for a permanent placement was immediate as early as a year before the termination hearing. Sweet testified that, given mother's cyclical history of recovery and relapse, child should not be subjected to the risk of another disrupted placement until mother demonstrates 18 to 24 months of sobriety and stability, dating from her last use of alcohol; Johnson, although advocating that mother be given a chance to parent, did not opine that reunification could occur immediately, nor does the record otherwise so indicate. A reasonable time for reunification has passed even were we to credit Johnson's view.
We therefore consider whether termination of mother's parental rights is in child's best interests. ORS 419B.500. We conclude that it is. Although mother loves child, and child vocalizes love for mother, the bond between them is not strong. Child refers to mother as her "visit mother" and views her foster family as her parents. Given child's immediate need for permanency and the improbability that mother can offer *831 her a safe home within a reasonable time, termination of mother's parental rights is in child's best interests.
Affirmed.
NOTES
[1] Mother's test results at that time also suggested neurological and intellectual impairment. However, Sweet later learned that, contrary to mother's statements during the evaluation, she had been intoxicated. Sweet believed that mother's intoxication was the primary reason for her apparent impairment.
[2] Mother also suffers from MRSA and is aware of what is necessary to treat the infection.
[3] Since learning of child's seizure disorder, mother has taken steps to learn more about the type of care child requires. At the time of the termination hearing, mother was scheduled to attend the next session of a class taught by Kao for parents of children with epilepsy.