ORTEGA, P. J.
*729 In this consolidated appeal, mother challenges judgments terminating her parental rights to her three children and the denial of her motion to terminate dependency jurisdiction as to the youngest child, A. We conclude that clear and convincing evidence establishes that mother has engaged in conduct and is characterized by conditions that remain seriously detrimental to all three children; that integration of the children into mother's home is improbable within a reasonable *1112 time due to conduct or conditions not likely to change; and that termination is in the best interests of each of the children. Accordingly, we affirm the juvenile court's judgments.
By way of overview, the two older children, M (born in 2004) and T (born in 2005), are in foster care for the third time, and A (born in 2013) is in foster care for the second time. The children have been in their current foster placement, with their paternal grandparents, since November 2014, and we have addressed the family's long-running involvement with the Department of Human Services (DHS) on two prior occasions. See Dept. of Human Services v. M. J. H. , 278 Or. App. 607, 609, 375 P.3d 579 (2016), rev. den. , 361 Or. 486, 395 P.3d 870 (2017) (vacating and remanding permanency judgments), and Dept. of Human Services v. M. A. H. , 284 Or. App. 215, 218-19, 391 P.3d 985, rev. den. , 361 Or. 486, 395 P.3d 870 (2017) (concluding that DHS made reasonable efforts to address mother's mental health needs and affirming permanency judgments). In this appeal of the termination judgments, we review the facts de novo , ORS 19.415(3)(a), and we recount the facts only as necessary to give context to our ruling, beginning with a summary of the procedural history for context.
I. FACTS
Mother and father had a relationship characterized by domestic violence, substance abuse, and child neglect that resulted in the removal of M and T from their care in 2010 and removal of all three children in 2013. M. J. H. , 278 Or. App. at 609, 375 P.3d 579. They were returned to parents' care for a second time in April or May of 2014. Id . In October of that *730 year, M contacted his aunt with concerns that mother was using drugs and, the following month, DHS again removed the children from mother's care and placed them in foster care with grandparents, where they have remained for the intervening years. Id. at 609-10, 375 P.3d 579.
In January 2015, as a consequence of that last removal from mother's care, the juvenile court took jurisdiction "based on the risk of harm created by mother's criminal activities, lack of parenting skills, substance abuse, and her practice of leaving the children with unsafe care providers." M. A. H. , 284 Or. App. at 218-19, 391 P.3d 985. In June 2015, DHS filed new dependency petitions, additionally alleging that "mother has mental health issues that interfere with her ability to safely parent her children." Id. at 219, 391 P.3d 985. The cases were not consolidated and proceeded on separate tracks, resulting in termination judgments on one of the tracks in June 2016, id. , while permanency judgments for the other cases were being appealed and were ultimately reversed. M. J. H. , 278 Or. App. at 614, 375 P.3d 579. As a result of that reversal, the juvenile court set aside the 2016 termination judgments and consolidated the two tracks of dependency cases. At a second termination trial, mother moved to dismiss jurisdiction and wardship as to all three children; the juvenile court denied those motions and entered judgments of termination.[1]
Mother has a long history of using drugs, neglecting the children's physical and medical needs, keeping the children in filthy living conditions, and being involved in violent relationships. She also has been physically violent with the children and has mental health issues. She made some progress in addressing some of these issues in the year before trial but did not exhibit good understanding of how her past behavior has affected the children and still endangers them.
Mother's history of substance abuse dates back as early as 2000. In October 2012, while pregnant with A, mother was reportedly using drugs in front of her children at an emergency shelter. She was admitted to a residential facility for methamphetamine detoxification in August *731 2013. More recent drug use is unclear. In early 2015, mother claimed abstinence from prescription opioids for over a year. During a drug and alcohol treatment assessment in November 2015, mother falsely denied ever using amphetamine and opiates and was diagnosed with opioid use disorder. Between November 2015 *1113 and October 2016, mother gave 79 UAs, all negative, but had three no-shows and two dilute UAs, and her treatment provider did not know if mother had a relapse plan in place. In August 2016, mother told Dr. Basham that she had started using methamphetamine at age 28 and last used in July 2015. At the time of that assessment, she had a prescription for Adderall, which contains amphetamine, and Basham believed that mother was "maintaining her addiction through the use of [Adderall]."
When Dr. Deitch evaluated mother in March 2015, she claimed to be taking Adderall for ADHD and to have had a recent bipolar episode. He later found out that mother was under the influence during the evaluation and concluded that her mental health problems predated her issues with substance abuse. She exhibited Dependent, Antisocial, and Borderline Personality Features. He further diagnosed her with stimulant use disorder, opioid use disorder, post-traumatic stress disorder related to domestic violence, rule-out bipolar disorder, and adjustment disorder with mixed depression and anxiety. At the time of trial, mother was in individual therapy with Crowe to address PTSD from domestic violence.
M testified that, in mother's home, he had felt that he had to help care for his younger siblings because they were not being fed or looked after or helped when they were hurt. In his words, "I just felt like I just became the parent." He sometimes stayed home from school to take care of his siblings, and occasionally ate non-food items such as pencils, paper, and bark chips because he was hungry and there was no food in the house.
Although mother's counselor, Crowe, sees progress in her ability to recognize the impacts of her behavior on the children, mother continues to display a tendency to minimize those impacts and to focus on the responsibility of others. Crowe acknowledged that mother continues to have *732 issues with being in denial and has limited insight into her parenting and the resulting damage to the children and blames some of those impacts on father's family, including grandparents. Mother identified the harm to be that the children "were scared," that they "had some neglect," and that they "have experienced a loss of family." She expressed the view that it was best for them to "be with their mom."
DHS caseworker Tannler, during a home visit in March 2017, discussed with mother that, as she was already aware, M did not want to return to her home. Mother expressed the view that grandparents had "soured" the children's view of her and poisoned them against her. Tannler told mother that M had explained that he did not trust her to continue in recovery; M expected that she would be back on drugs in two weeks and he would again not be able to go to school, would have to hide from the police, and he would have to parent his siblings. Mother maintained that those fears were all the result of poisoning by grandparents. According to Tannler, "all I'm hearing [from mother] is blaming of others and a minimizing of the impacts that have occurred to the kids."
Mother maintained that, if the children were returned to her, she would not allow them to continue a relationship with grandparents, even while she acknowledged A's bond with grandparents (with whom she has lived most of her life) and that severing contact with grandparents would be detrimental to all three children. Deitch opined that cutting off contact with grandparents would be harmful to the children and that mother's determination to do so shows a lack of insight and a deficit in her understanding of what a child would need.
Quaresma, a therapist working with M and T, met with mother in March 2017 to discuss the prospects for resuming visits with the children, which had been suspended for about a year, pending the outcome of the termination trial. When Quaresma explained the concerns about returning the children, given mother's history of relapse and the children's multiple removals from her care, mother deflected those concerns; she attributed that history to her "bad relationship" with father and noted that her oldest son *733 (not involved in this case) had shown improvement since he started visiting her. Quaresma found mother to be "lacking some insight as to the impact of the trauma that the children have been through." She noted that mother did not take "a lot of accountability *1114 * * * for some of her actions and choices."
Dr. Basham evaluated mother in August 2016 and interviewed her by phone again in January 2017, shortly before trial. At trial he indicated that he did not know "the details of what issues and special needs the * * * children may present" but that he sees mother "as having a positive prognosis for basically living a reasonably stable life and engaging as a parent, functioning as a parent in general." He acknowledged, however, that he lacked sufficient information about the children's needs to form an opinion about whether mother could be reunited with them within a reasonable time, but he noted that mother displayed nothing "anywhere close to * * * true insight and taking responsibility for" the conduct and conditions that led to the children's removal. He opined that, before they could safely be returned to her care, "she'll need to take accountability for it and stop blaming others for their placement in foster care."
In the time between the trial court's entry of the prior 2016 termination judgments, the court's vacation of those judgments, the subsequent permanency hearing, and the trial at issue in this appeal, DHS did not allow or facilitate any visits between mother and the children. Thus, by the time of trial, mother had not visited with the children since April 2016. M did not want to visit mother or live with her; T was open to visits but wanted to continue living with grandparents.
Mother had demonstrated poor parenting skills during visits, which had been "chaotic." She yelled at the children and encouraged A to hit her. M and T physically fought, and mother encouraged them or could not stop them. M reported that, when he lived with her, mother had hit him with "[r]andom items around the house that she could get her hands on," including belts and a coat hanger, and would yank the children by the hair and push them around "[a]ll the time." Mother denied any physical violence toward *734 the children, but other family members, including father, reported incidents when she had been violent.
Both M and T exhibited serious tooth decay requiring extractions when they were removed from mother's care in 2010 and 2013. Both have undergone evaluations while in foster care that reveal significant emotional and psychological difficulties related to experiences of neglect, police interventions, drug use by mother, and violence between their parents. T has been diagnosed with ADHD and an adjustment disorder and suffers from anxiety. He has developed a strong bond with grandparents and is ambivalent toward mother. In his September 2016 evaluation with Dr. Munoz, he indicated that he would agree to live with parents only if "they promised that they both have a nice job and a nice house and everything is organized and they won't do drugs again"; however, he doesn't know if they could do that.
M has been diagnosed with an adjustment disorder with mixed anxiety and depressed mood; after the second removal he also was eating non-food objects such as pencils and erasers, but that has ceased to be a concern. M cares very much about mother but does not want to live with her again, because he does not trust that she can alter her former pattern of relapsing when the children were returned. He is closely bonded to grandparents.
Both boys have experienced significant trauma and exhibit anxiety and anger. T has behavioral issues; he is impulsive and has difficulty regulating his behavior. Both boys are hypervigilant and have trouble concentrating.
A is now on track developmentally but is at risk for attachment issues given her history of placement disruptions. She is bonded to grandparents and, at her age, a disruption of that attachment would be very detrimental.
II. TERMINATION HEARING
During the termination hearing, mother filed a motion to dismiss to terminate the wardship of all three children. In denying her motion, the court concluded that, due to mother's criminal activities, failure to remedy her *735 substance abuse and parenting skills in addition to her mental health issues and inability to leave her children in the care of safe providers, there were grounds for jurisdiction. *1115 At the conclusion of the hearing, the court terminated mother's parental rights to all three children due to unfitness. The court concluded that the following conduct or conditions of mother were seriously detrimental to the children: (1) addictive or habitual use of intoxicating liquors or controlled substances; (2) exposure and the risk of exposure of children to domestic violence; (3) lack of effort or failure to obtain and maintain a suitable or stable living situation for the children; (4) failure to learn or assume parenting skills and/or housekeeping skills sufficient to provide a safe and stable home for the children; (5) physical neglect of the children; (6) an emotional illness, mental illness, or mental deficiency; (7) lack of effort to adjust her circumstances, conduct or conditions to make return of the children to her possible; and (8) failure to effect a lasting adjustment for such extended time that it appears reasonable that no lasting adjustment can be effected.
III. ANALYSIS
The juvenile court will terminate a parent's rights due to unfitness if the court finds by clear and convincing evidence that the parent is unfit due to "conduct or condition seriously detrimental to the child" and that "integration of the child * * * into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504. Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." State ex rel. Dept. of Human Services v. A. M. P. , 212 Or. App. 94, 104, 157 P.3d 283 (2007) (internal quotation marks omitted). A parent's fitness is measured at the time of the termination trial, State ex rel. Dept. of Human Services v. Simmons , 342 Or. 76, 96, 149 P.3d 1124 (2006), and the focus of the test is "on the child, not just the seriousness of the parent's conduct or condition in the abstract." State ex rel. SOSCF v. Stillman , 333 Or. 135, 146, 36 P.3d 490 (2001). Finally, termination of parental rights must be in the child's best interests. ORS 419B.500.
*736 To determine if a parent is unfit, courts engage in a two-step analysis. Stillman , 333 Or. at 145, 36 P.3d 490. First, the court determines whether "(1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child." Id . "Second-and only if the parent has met the foregoing criteria-the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' " Id . In evaluating the second step, the court must "evaluate the relative probability that, given particular parental conduct or conditions, the child will become integrated into the parental home 'within a reasonable time.' " Id . at 145-46, 36 P.3d 490. The "reasonable time" standard is child-specific-the particular period of time that "is reasonable given a child['s] emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).
On appeal, mother argues that the juvenile court erred in denying her motion to terminate the wardship as to A, and also erred in terminating her parental rights to all three children because the evidence does not establish that she is currently unfit. She further argues that DHS failed to establish that the time required to address the alienation of M and T is unreasonable given their circumstances. Finally, she argues that DHS failed to establish that termination of her parental rights is in the best interest of any of the children.
On de novo review, we conclude that the evidence is clear and convincing that, despite the progress that mother has made in the year before trial, mother is nevertheless unfit due to current conditions that, in combination, remain seriously detrimental to the children. See State ex rel. Juv. Dept. v. F. W. , 218 Or. App. 436, 469, 180 P.3d 69, rev. den. , 344 Or. 670, 189 P.3d 25 (2008) (evidence of current detrimental effects on the children is pertinent to parent's unfitness, as well as to whether reunification is improbable within a reasonable time). Given that conclusion, we also conclude that the juvenile court correctly denied mother's motion to terminate A's wardship.
*1116 *737 To determine whether mother's conditions remain detrimental to the children, we must consider the children's needs in the context of the history of this case. See Dept. of Human Services v. K. M. M. , 260 Or. App. 34, 45-46, 316 P.3d 379 (2013), rev. den. , 354 Or. 837, 325 P.3d 738 (2014). The children in this case have spent an extended period of time in the foster care of their grandparents; indeed, A has spent the majority of her life in their care. The children have also endured a history of neglect and deprivation and a series of placement disruptions-yet mother has indicated that, while she would cooperate with a gradual return to her care, her intention is to terminate the children's relationship with grandparents, whom she blames for the fact that M and T do not wish to return to her custody, and despite her recognition that such a move would be detrimental to them.
In mother's view, she is no longer using drugs, is no longer living with father, and has maintained a stable life that will enable her to parent the children. However, her failure to recognize her own pattern of relapse and how that may play into the fears of M and T undercuts her claims that drug use is no longer of concern; her period of sobriety, however stable it may be, has occurred while the children were out of her custody, and her failure to reckon with the costs to the children of her history of drug dependence rises to the level of present unfitness even if she is currently sober. So, likewise, does her lack of concern about disrupting the children's current attachments; M and T have significant emotional and behavioral challenges, and mother's inability to recognize how her history has contributed to those challenges, instead blaming the caregivers who have provided the children with a stable placement, undermines her claim that she is ready to provide them with minimally adequate care. Where, as here, the children "have special needs and are healthily bonded to their foster parents, the issue is * * * whether the parent has waited too long to reform in light of the child's pressing needs." State ex rel. Dept. of Human Services v. A. L. S. , 228 Or. App. 700, 723, 209 P.3d 817, rev. den. , 347 Or. 43, 217 P.3d 689 (2009) (citing F. W ., 218 Or. App. at 464, 180 P.3d 69 ). Mother's reforms-which are tenuous and untested at best-are insufficient here and pose a continued risk of harm to the children. Furthermore, we conclude *738 that further delays in establishing a permanent placement for the children to allow mother to rebuild her relationships with M and T, given the time that has passed and her failure to reckon with how her past behavior has affected them, would be unreasonable under the circumstances.
Finally, we conclude that termination of mother's parental rights is in the best interests of the children. A has spent the majority of her life in foster care and has experienced developmental delays; continued delays in permanency will only compromise her best interests in forming healthy attachments. M and T, likewise, have spent significant portions of their lives in foster placements and disrupted placements with mother, and both continue to deal with emotional and behavioral challenges as a result. Mother's unwillingness to grapple with the reasons for their struggles makes termination of her parental rights the best option for achieving the stability they need.
Affirmed.

Father's parental rights were terminated based on uncontested allegations; those judgments are not at issue in this appeal.